FIFTH DIVISION
October 17, 2008

No. 1-06-2007

| | | |
|---|---|---|
| *In re* JESSICA M., a Minor | ) | Appeal from the |
| (The People of the State Of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Jessica M., a Minor, | ) | Honorable |
| | ) | Noreen M. Daly, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TOOMIN delivered the opinion of the court:

Following a hearing, the respondent, Jessica M., was adjudicated delinquent for the offense of aggravated battery. On appeal, respondent asserts that: (1) the State failed to prove her delinquent beyond a reasonable doubt; (2) the trial court erred in refusing to allow reputation testimony about the victim; (3) the court erred in finding her guilty on two counts of aggravated battery, in violation of the one-act, one-crime rule; (4) her sentence of probation must be modified to end on her twenty-first birthday; and (5) the mandatory DNA statute is unconstitutional as violative of respondent's fourth amendment rights and privacy rights under the Illinois Constitution. For the following reasons, we affirm the trial court's order, but modify respondent's term of probation.

BACKGROUND

The amended petition for adjudication of wardship of Jessica M. stemmed from her alleged beating of Rosalinda Rodriguez at 3011 South Farrell, in Chicago, on the night of June

10, 2005. The evidence presented at the adjudication hearing established that between 11 and 11:30 p.m., respondent and five other girls were walking down South Farrell Street. The girls, who were unusually loud, stopped by the gate to the backyard of Rosalinda's home. Rosalinda, a college student, was at home with her two younger sisters when she heard the noise. Rosalinda then looked out the kitchen window into the backyard and saw six girls standing at the edge of her property. She recognized all the girls, including respondent, from the neighborhood. Rosalinda walked out of her house and through her backyard and out the gate to ask them why there were there. She locked the gate from the outside behind her, so that the girls could not come into the yard and so her dog would not get out. At that time, the victim was 19 years old, and 5-feet-7-inches tall and weighed 140 pounds.

Once Rosalinda was outside the gate, she heard respondent mumble something, so she approached respondent to ask her what she had said. According to Rosalinda, respondent then punched her in the face with her closed fist. Rosalinda reacted by punching her back in the face with her fist, and then backed away as respondent closed in on her, pinning Rosalinda against the backyard fence. Rosalinda ran into the street, where the other girls surrounded her and "cheered on" respondent as she punched Rosalinda in the face again with her closed fist. Rosalinda testified that although she tried to back away, she slipped on the curb and fell down on the street. Respondent got on top of Rosalinda and attempted to gouge out her eyes. Rosalinda resisted by twisting her body and moving her head, so respondent grabbed Rosalinda's hair and slammed her head against the pavement more than three times.

Rosalinda managed to push respondent off and started to get up but respondent then

struck her across the face with what she believed was a bottle handed to respondent by one of the other girls. She fell backwards on the cement and momentarily lost consciousness. When Rosalinda opened her eyes, respondent was once again on top of her, punching her in the head, while the other girls were kicking her. She then felt someone pull her and respondent apart. Rosalinda testified that during the attack, she hit respondent back between three and five times.

Rosalinda's 12-year-old sister, Priscilla, testified that she ran out of the house when she saw Rosalinda being attacked and tried to push respondent off of her, but one of the other girls, Candace A., hit Priscilla with a shoe. Although Priscilla initially testified that the girls were in the backyard, she clarified on cross-examination that they were on the sidewalk at the gate to the backyard.

In turn, the victim's brother, Esvelda, and Mike Palamino, a deputy sheriff who lived down the block, both arrived on the scene and pulled the girls apart. When Rosalinda got back on her feet, she "blacked out" again and then felt blood on her face. Later, Rosalinda's mother accompanied her to Loyola Hospital, where upon admission into the trauma unit, CAT scans and MRI tests were performed. Rosalinda stayed at Loyola Hospital for one day and received a total of nine stitches on her face, some under her right eyebrow and some on the left side of her chin. Rosalinda's mother photographed her injuries at the hospital, two of which were admitted at trial.

Rosalinda filed a police report several days after the attack; however, she did not tell the reporting officer that there was glass in the street near the gate to her backyard that had been broken over her head. The State filed a petition for adjudication of delinquency against

respondent and later filed an amended petition adding an additional count of aggravated battery. At the close of the State's case, respondent moved for a directed finding, which the court denied.

Respondent's neighbor, Emmanuel Fabela, appeared as a witness on respondent's behalf. Fabela testified that at about 9:30 on the night of the incident he was on his front porch smoking a cigarette when he saw a group of about five girls, including respondent, walking together down Farrell street, talking unusually loudly. They stopped three houses down from him, at which point the tallest of the girls, whom he identified in court as respondent, started to yell. Then, according to Fabela, a girl came out from the house, jumped over the gate, and came up to respondent. Fabela claimed that the girl who came out, whom he never identified, got within five inches of respondent's face and pushed her. Then the two girls started fighting, first trading blows on their feet, and then rolling around on the street. The fight lasted about two minutes and ended when the girls were separated by Deputy Palamino and a male who came out from the house. According to Fabela, no one hit the girl from the house on the head with a bottle, banged her head against the curb, or kicked her when she was on the ground.

Under cross-examination, Fabela maintained that he did not know the relatives, parents, or friends of any of the respondents. However, Fabela acknowledged that the father of one of the other girls who was charged put him in touch with respondent's counsel. Fabela spoke with counsel on the telephone, then in person, and also conferred with an investigator from the public defender's office, who represented other respondents. However, Fabela did not speak with any of the investigators or attorneys from the State's Attorney's office who attempted to interview him, nor did he speak with an assistant State's Attorney who approached him before he testified

1-06-2007

at trial.

Respondent also testified on her own behalf. According to respondent, she was walking to her grandmother's house with four girls. Two of the girls in the group of six were not actually with her. The girls were talking amongst themselves and upon approaching Rosalinda's house, she heard Rosalinda say, "What did you say? Can you say it to my face?" Respondent then stopped, at which point Rosalinda jumped over the gate and came up to respondent, causing her to move back about two feet. Rosalinda again stated, "Say it to my face." Respondent asked, "Say what?" and Rosalinda then pushed her backwards. Respondent stumbled back and they started to fight, falling to the ground at some point and then rolling around. Respondent testified that Rosalinda hit her multiple times. Respondent admitted that she also struck the victim, but never with a bottle, and she never banged Rosalinda's head against the ground, nor did anyone kick her.

Respondent testified that after the fight, she had scratch marks and bruises on her body from the victim's punches and scratches, and abrasions on her knees and elbows from rolling around. She never sought medical treatment for her injuries, nor did she contact the police to report that Rosalinda had beaten her. Respondent's grandmother took pictures of her injuries about a week after the incident, and they were admitted at trial. Rosalinda admitted that the photographs depicted injuries that included wounds caused by her fists.

Two reputation witnesses also testified on behalf of respondent, Jack Wilson and Suzie Jimenez, neither of whom was present when the incident happened. Wilson, a vice president of a local small truck parts distributing company, lived in the neighborhood for 36 years and had

-5-

known respondent for about 7 years. Wilson testified that he is a good friend of respondent's family. Respondent was Wilson's daughter's counselor at the Bettenhouse Community Settlement for two years, where respondent supervised around 20 to 25 children from Bridgeport. Wilson testified that, based on conversations with his daughter and others, respondent was known in the community as a truthful and peaceful person.

Jimenez was a real estate broker and also worked as an organizer for Chicago Alternative Policing Strategy (CAPS). Jimenez became familiar with respondent through her work. Jimenez testified that, based on her conversations with various members of the community with whom she dealt as a CAPS organizer, respondent's reputation for peacefulness and truthfulness was good. Defense counsel then asked Jimenez whether she was aware of Rosalinda's reputation for peacefulness through her contacts as a CAPS community organizer, whereupon the State objected, based on a lack of foundation. The trial court sustained the objection, ruling that defense counsel failed to lay the proper foundation for such testimony. When defense counsel again attempted to elicit the reputation testimony, this time based on her "experience as a resident of that community," as well as her experience as a CAPS community organizer, the trial court again sustained the foundation objection. In an offer of proof, defense counsel represented that if allowed, Jimenez would have testified that Rosalinda's reputation in the community for peacefulness and truthfulness was not good.

The trial court found respondent delinquent on both counts of aggravated battery. In reaching its decision, the court noted that it had considered all of the evidence, and reviewed all of the testimony and arguments of the parties, as well as the case law and applicable statutes

submitted by defense counsel. The court specifically found that respondent was not justified in her use of excessive force, even if one assumed that Rosalinda was the initial aggressor, as the response by respondent was unreasonable. The court found that respondent's continued attacks when she was no longer in any reasonable danger, and the extent and severity of the victim's injuries, negated her claim of self-defense.

The State also filed petitions against respondent's minor friends alleging aggravated battery that were adjudicated in separate but simultaneous hearings. The trial court acquitted one of the other girls based on her alibi defense, but found the remaining five girls also delinquent based on the aggravated battery of Rosalinda. The court sentenced respondent to five years' probation, commencing on May 4, 2006, and ordered her to submit a saliva sample for DNA indexing under the controlling statute.

ANALYSIS

I. Sufficiency of the Evidence

Respondent argues that she was not proven guilty beyond a reasonable doubt of aggravated battery, because the trial court ignored Fabela's testimony and rejected her claim of self-defense. On review, the applicable standard is whether the decision of the trial court is against the manifest weight of the evidence. We must determine, after viewing the evidence in the light most favorable to the State, whether any rational trier of fact could have found that the elements of the offense were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, , 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979); *People v. Pollock*, 202 Ill. 2d 189, 217, 780 N.E.2d 669, 685 (2002). To properly raise a claim of self-defense, there must be

evidence of each of the following elements: "(1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 213 Ill. 2d 218, 224-25, 821 N.E.2d 307, 311 (2004). See also 720 ILCS 5/7-1 (West 2004). A trier of fact is "not obligated to accept a defendant's claim of self-defense," but instead must consider the probability or improbability of the testimony, the surrounding circumstances, and the testimony of other witnesses. *People v. Rodriguez*, 336 Ill. App. 3d 1, 15, 782 N.E.2d 718, 729 (2002).

Respondent argues that the trial court erred when it "ignored" the testimony of her neighbor Emmanuel Fabela. However, as the record reflects, the trial court expressly stated that it had considered all of the evidence in reaching its finding of delinquency. Moreover, the court specifically identified portions of Fabela's testimony that corroborated other evidence, namely, that the girls were unusually loud for the time and location and that they had stopped and congregated behind the victim's property. However, the court specifically stated that it did not find credible Fabela's testimony that the victim pushed respondent first. Thus, the record clearly contradicts respondent's claim that the trial court "ignored" Fabela's testimony.

In rejecting respondent's claim of self-defense, the trial court relied, *inter alia,* on *People v. Balfour*, 148 Ill. App. 3d 215, 498 N.E.2d 547 (1986). In *Balfour*, as in the instant case, the defendant claimed the victim initiated the fight. Nonetheless, entitlement to self-defense was negated by evidence showing that the defendant then proceeded to beat the victim to death by

kicking and stomping on him after he was lying unconscious on the ground. *Balfour*, 148 Ill. App. 3d at 222-23, 498 N.E.2d at 553-54. However, in the instant case, the court found that while Rosalinda may have been up close to respondent, she was not the aggressor, and that both Rosalinda's and respondent's own testimony supported that finding. The trial court found that respondent punched first, and the attack rapidly escalated from there. Moreover, the court further reasoned that "even assuming arguendo" that Rosalinda shoved respondent first, any claim of self-defense could not be "reasonably raised" in light of the severity of the beating of Rosalinda, and that respondent's continued attacks were objectively unreasonable and constituted excessive use of force, thereby negating one of the necessary elements of self-defense. We conclude from our review of the record that the severity of Rosalinda's injuries, contrasted with the few abrasions respondent sustained, manifestly supports the trial court's finding that respondent's use of force was unreasonable and excessive, thus warranting rejection of her claim of self-defense.

We further find that respondent's reliance on *People v. Bowie*, 36 Ill. App. 3d 177, 343 N.E.2d 713 (1976), and *People v. Mitchell*, 152 Ill. 2d 274, 604 N.E.2d 877 (1992), is entirely misplaced, as the record in the instant case clearly demonstrates that the trial court considered all the evidence in making its credibility determinations. The court's decision to believe Rosalinda's account of the attack, rather than respondent's, is virtually unassailable on appeal. *People v. Titone*, 115 Ill. 2d 413, 422, 505 N.E.2d 300, 303 (1986) ("It is peculiarly the prerogative of the trier of fact to judge the credibility of witnesses"). This court will not substitute its judgment for that of the trial court on questions involving the credibility of witnesses. *People v. Coleman*, 301 Ill. App. 3d 37, 42, 704 N.E.2d 690, 694 (1998). Respondent

has not met her burden to show that no rational trier of fact could have found that the elements of the offense were proven beyond a reasonable doubt. Therefore, we will not disturb the judgment of the trial court.

## II. Exclusion of Evidence of Rosalinda's Reputaion

Respondent next contends that the trial court erred when it sustained the State's foundation objection, thereby preventing defense counsel from eliciting testimony concerning the violent character of the victim. On review, a trial court's decision concerning the admissibility of evidence will not be reversed absent a clear abuse of discretion resulting in prejudice to the defendant. *People v. Ward,* 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702 (1984). In meeting that standard, it is incumbent upon the complaining party to demonstrate that the trial court's determination was "arbitrary, fanciful, or unreasonable," or "where no reasonable [person] would take the view adopted by the trial court." *People v. Donoho*, 204 Ill. 2d 159, 182, 788 N.E.2d 707, 721 (2003).

Generally, character evidence regarding a victim's propensity for violence is admissible when self-defense is interposed to show that the victim was the aggressor or where there are conflicting accounts about what happened. *People v. Lynch*, 104 Ill. 2d 194, 199-200, 470 N.E.2d 1018 (1984); *In re D.N.*, 178 Ill. App. 3d 470, 474-75, 533 N.E.2d 84 (1988). Proper foundation for reputation testimony is established when the witness is shown to have "adequate knowledge of the person queried about" and the evidence of reputation is "based upon contact with the subject's neighbors and associates rather than upon the personal opinion of the witness. [Citations.]" *People v. Moretti*, 6 Ill. 2d 494, 523-24, 129 N.E.2d 709, 725 (1955).

Here, the court specifically stated that its ground for excluding this evidence was based on the fact that Jimenez's knowledge came solely through her position as a CAPS organizer:

> "Counsel, I don't know where you are going with this line [of questioning] with respect to her position in the CAPS division.
>
> And this court is familiar with respect to the CAPS volunteers. I don't know how you are ever going to get into this line of questioning in that reputation unless you are going to on this witness set specific, somewhat specific foundation, but it is not going to come in on this basis."

Then defense counsel once more attempted to elicit the reputation testimony, this time based on her "experience as a resident of that community," as well as her experience as a CAPS community organizer. Again, however, the record fails to reflect that a satisfactory foundation was laid; that Jimenez's purported knowledge of Rosalinda's character was through conversations with either her neighbors or associates.

As noted, the decision of whether a witness is sufficiently qualified to testify as to reputation rests within the sound discretion of the trial court and a reviewing court will not disturb it absent an abuse of that discretion. *People v. Clauson*, 261 Ill. App. 3d 373, 377, 633 N.E.2d 915, 918 (1994). Here, the trial court did not abuse its discretion in excluding the proffered testimony where it was based on discussions with half a dozen unidentified members of the community through the witness's role as a CAPS organizer, and no evidence was offered to show that the proffered reputation testimony was based on contact with individuals who were Rosalinda's neighbors and associates.

-11-

The offer of proof was similarly inadequate to show that the testimony would have been admissible. An offer of proof regarding the reputation testimony sought to be admitted would include the foundation prerequisite to the admission of such evidence at trial (*Clauson*, 261 Ill. App. 3d at 377, 633 N.E.2d at 918), but here the offer did not address whether any of the people Jimenez spoke with in the "community" were either Rosalinda's neighbors or associates. This crucial missing link to the victim undermined the requisite foundation for such evidence.

Moreover, the record also supports the State's assertion that the reputation evidence was properly excluded because the trial court rejected respondent's claim of self-defense, thereby rendering any testimony as to Rosalinda's reputation for peacefulness irrelevant. See *In re D.N.*, 178 Ill. App. 3d 470, 475-76, 533 N.E.2d 84, 88 (1988). Given the trial court's finding of excessive force, we hold that the court's ruling was reasonable.

Therefore, we affirm the trial court's ruling excluding Jimenez's proffered character evidence regarding Rosalinda.

### III. Application of the One-Act, One-Crime Rule in Juvenile Cases

Respondent submits that the trial court erred in adjudicating her delinquent on two counts of aggravated battery where both counts were based on a single act. In the instant case, the State charged respondent with two counts of aggravated battery based upon sections 12-4(a) and 12-4(b)(8) of the Criminal Code of 1961. (720 ILCS 5/12-4(a), (b)(8) (West 2004). Count I alleged that respondent caused great bodily harm to Rosalinda by striking her in the head multiple times, causing a laceration that required stitches, whereas count II alleged that she struck Rosalinda multiple times, causing lacerations to her face and body, while Rosalinda was on a public way.

1-06-2007

Because the State charged respondent with the same conduct under different theories of culpability, she argues that under the *King* doctrine multiple adjudications cannot stand. *People v. King*, 66 Ill. 2d 551, 559-66, 363 N.E.2d 838, 841-44 (1977). See also *People v. Crespo*, 203 Ill. 2d 335, 342-44, 788 N.E.2d 1117, 1121-22 (2001).

The State initially argues that respondent has waived this argument on appeal by failing to raise this issue orally before the trial court or in her posttrial motion. However, the rule of waiver operates as a limitation on the parties and not as a limitation on the jurisdiction of this court. *In re W.C.*, 167 Ill. 2d 307, 323, 657 N.E.2d 908, 917 (1995), citing *In re C.R.H.*, 163 Ill. 2d 263, 644 N.E.2d 1153 (1994). Notwithstanding respondent's forfeiture of this claim, in the interest of justice we choose to address this issue. As the issue presents a question of law, our review is *de novo*.

The State submits that the one-act, one-crime rule does not apply to juvenile proceedings, which are "distinct and different from a criminal prosecution." *In re C.J.*, 328 Ill. App. 3d 103, 111, 764 N.E.2d 1153, 1159 (2002), quoting *People v. Woodruff*, 88 Ill. 2d 10, 18-19, 430 N.E.2d 1120 (1981). The State posits that under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2004)), "juvenile offenders are not criminals; proceedings under the Act are not criminal prosecution; adjudications under the Act are not convictions and a minor so adjudicated does not suffer the consequences of a criminal conviction." *Woodruff*, 88 Ill. 2d at 19, 430 N.E.2d at 1124. We agree with the State's analysis that the one-act, one-crime principle has no application where, as here, a juvenile found delinquent because she committed multiple offenses is adjudicated delinquent but once.

We likewise reject respondent's argument that multiple offenses cannot be supported by the record in this case. Here, the State's original petition alleged that respondent was delinquent for a single count of aggravated battery predicated upon great bodily harm. While the petition alleged that respondent struck Rosalinda multiple times and caused lacerations (plural) to her face, it clearly referenced only one beating. Count II of the amended petition recited much of the same language as count I, and additionally alleged the beating occurred on a public way. Thus, under the State's theory of prosecution, if supported by the evidence, the trial court could have properly found that respondent's conduct resulted in great bodily harm, as alleged in count I, or only bodily harm but on a public way, as alleged in count II. Though the court indeed found respondent guilty as to both counts, there nonetheless was but a single adjudication of delinquency. Moreover, the order imposing probation, the dispositional order, does not reference the number or nature of the offenses, and there was only one sentence of probation imposed.

In *In re N.S.*, 326 Ill. App. 3d 1094, 762 N.E.2d 1143 (2002), although the State provided evidence from which the trial court could find multiple offenses, the reviewing court determined that because there was only a single adjudication of delinquency, the minor did not suffer any prejudice. *N.S.*, 326 Ill. App. 3d at 1095-96, 762 N.E.2d at 1145. In *N.S.*, as here, there was only one dispositional order that did not "subject the minor to a greater punishment by reason of a finding of multiple offenses." *N.S.*, 326 Ill. App. 3d at 1096, 762 N.E.2d at 1145.

Similarly, in *In re Mareno*, 43 Ill. App. 3d 556, 357 N.E.2d 592 (1976), the State filed a petition containing two counts charging the offenses of aggravated assault and criminal damage to property, both of which were based on the single act of firing a shotgun. At the conclusion of

the evidence, the court entered a finding of delinquency as to each count. The *Mareno* court affirmed and held that "upon the filing of the single petition for adjudication of wardship there could be but one finding of delinquency, even though predicated upon multiple offenses which may have arisen out of the same conduct." *Mareno* 43 Ill. App. 3d at 558, 357 N.E.2d at 594.

In *In re Ricardo A.*, 356 Ill. App. 3d 980, 827 N.E.2d 894 (2005), the minor respondents argued that the one-act, one-crime principle was violated where the charge of armed robbery was based on the same act as the charges for vehicular hijacking and the minors were adjudicated delinquent on all the offenses. *Ricardo A.*, 356 Ill. App. 3d at 992, 827 N.E.2d at 905. Although the court declined to review under plain error, it nonetheless determined that even if it were to review the issue, no modification would be necessary, as "there was a single adjudication of delinquency and a single sentence." *Ricardo A.*, 356 Ill. App. 3d at 998, 827 N.E.2d at 909.

Respondent's reliance on *In re W.C.*, 167 Ill. 2d 307, 657 N.E.2d 908 (1995), is readily distinguishable and misplaced. In *W.C.*, our supreme court applied the one-act, one-crime principle in a juvenile delinquency context where the dispositional order of incarceration reflected two counts of first degree murder when only one murder had occurred and despite the trial court's merger into a single count supporting its finding of delinquency. *W.C.*, 167 Ill. 2d at 342-43, 657 N.E.2d at 925-26. Although the court agreed with the State that any confusion could be addressed by reference to the record, "in the interests of justice and judicial economy," it modified the dispositional order to reflect that the respondent's "commitment to the Department of Corrections" was based on only one offense of first degree murder. *W.C.*, 167 Ill. 2d at 343, 657 N.E.2d at 926.

1-06-2007

An identical result obtained in *In re D.H.*, 381 Ill. App. 3d 737, 886 N.E.2d 1209 (2008), where the dispositional order entered by the trial court was modified on appeal to reflect only one finding of delinquency. There, the trial court's order had reflected two counts of criminal sexual abuse, notwithstanding that one of the counts was actually a lesser-included offense based on the same acts. Although the State argued that the two counts were based either on two separate "pokes" or on two different acts, that contention was unsupported by the record. Accordingly, the dispositional order was modified. *D.H.*, 381 Ill. App. 3d at 747, 886 N.E.2d at 22.

To reiterate, in the case at bar there was but one adjudication of delinquency, and the dispositional order does not reflect that the probation was based on multiple offenses. Therefore the one-act, one-crime principle has no application. As the holdings in *W.C.* and *D.H.* make clear, in juvenile cases where either there are multiple adjudications, or where the dispositional orders imposing punishment improperly reflect multiple counts or offenses based on the same act, such orders must be modified to reflect only one adjudication of delinquency. As there was only one adjudication and no reference to multiple offenses in the dispositional order here, we are simply not presented with the problem complained of by respondent. Thus, we affirm respondent's adjudication and there is no need for modification or correction of her dispositional order upon this ground.

### IV. Modification of Term of Probation

The parties agree that respondent's term of probation should be modified to terminate on respondent's twenty-first birthday, which is on June 20, 2010. The Juvenile Court Act of 1987 provides that all proceedings under the Act terminate automatically when the minor attains the

age of 21 years. 705 ILCS 405/5-755 (West 2004). See also *In re Jaime P.*, 223 Ill. 2d 526, 539-40, 861 N.E.2d 958, 966 (2006) (the plain intent of the legislature was to set the age of 21 as the maximum term for disposition, with the limited exception of extended jurisdiction juvenile prosecutions). Therefore, under the clear mandate of the legislature's provisions in the Juvenile Court Act, as interpreted by the Illinois Supreme Court in *In re Jaime P.*, we modify respondent's term of probation to terminate on June 20, 2010.

### V. Constitutionality of the Population Statistics Database

Finally, respondent argues that section 5-4-3(f) of the Unified Code of Corrections (730 ILCS 5/5-4-3(f) (West 2004)), the DNA indexing statute, is unconstitutional on the following grounds: violation of her federal and state constitutional right to be free from unreasonable searches and seizures; violation of privacy rights under the Illinois Constitution because minors are entitled to greater privacy rights than adults (Ill. Const. 1970, art. I, §6); and additional privacy intrusions resulting from the creation of a population statistics database accessing highly personal genetic information. Notably, however, the recent Illinois Supreme Court decision *In re Lakisha M.*, 227 Ill. 2d 259, 882 N.E.2d 570 (2008), is precisely on point, as there the Illinois Supreme Court clearly and succinctly rejected all of these arguments except the last one.

Respondent acknowledges the holding of *Lakisha M.* in her reply brief, but stands on her opening brief, thus leaving unresolved the issue of the constitutionality of the provision promulgating the creation of a "population statistics database." The Illinois Supreme Court in *Lakisha M.* was presented with "as applied" fourth amendment and privacy challenges to the statutory provision for the population statistics database, which it rejected. Here, we are

presented with a facial constitutional challenge to the provision under the privacy rights of the Illinois Constitution. Ill. Const. 1970, art. I, §6. In this case, respondent clearly argues that the population statistics database provision is unconstitutional generally, and she does not limit her argument to unconstitutionality as applied to her as a minor or as a nonsexual offender. Thus, the constitutionality of the provision for the use of genetic marker grouping analysis information in the population statistics database presents a justiciable issue, and respondent's constitutional challenge to the face of the statute is ripe for consideration by this court.

Since the constitutionality of a statute presents a question of law, our review is *de novo*. *People v. Garvin*, 219 Ill. 2d 104, 116, 847 N.E.2d 82, 89 (2006), citing *People v. Wilson*, 214 Ill. 2d 394, 399, 827 N.E.2d 416 (2005). To successfully challenge a statutory provision on its face, respondent "must fulfill the difficult task of establishing the statute's invalidity under *any* set of facts." (Emphasis in original.) *Garvin*, 219 Ill. 2d at 117, 847 N.E.2d at 89, citing *People v. Greco*, 204 Ill. 2d 400, 407, 790 N.E.2d 846 (2003). Therefore, we must begin with the presumption that section 5-4-3 is constitutional, and we are constrained to construe this section as constitutional "whenever reasonably possible." *Garvin*, 219 Ill. 2d at 116, 847 N.E.2d at 89, citing *Wilson*, 214 Ill. 2d at 398-99, 827 N.E.2d 416. As the challenger in this case, respondent bears the heavy burden of demonstrating a clear constitutional violation. *Garvin*, 219 Ill. 2d at 116, 847 N.E.2d at 89, citing *Wilson*, 214 Ill. 2d at 399, 827 N.E.2d 416.

Respondent asserts that the use of genetic marker grouping analysis for a "population statistics database" under section 5-4-3(f)(iii) raises Illinois constitutional privacy concerns because that phrase is undefined. Moreover, she claims the statute "appears to allow the State to

statistically chart personal genetic information" obtained from offenders' DNA to "determine the characteristics most often attributed to offenders" and is "seemingly allowing behavioral research on possible genetic links between race, gender, genetic-based behavioral disorders, or physical characteristics and certain types of criminal behavior."

Respondent's argument clearly misapprehends the very nature of the information that is included in the database, as well the legitimate use of the information it contains. As will be demonstrated, the genetic markers that are analyzed and maintained within the database simply do not contain the type of genetic information assailed by respondent. A cursory review of the widely accepted and commonly understood theory and technology of DNA profiling will serve to dispel respondent's misconceptions. Additionally, an analysis of the enactment and the statutory scheme will reveal the legislative intent relative to respondent's facial constitutional challenge.

DNA is composed of the familiar double-helix strand of nucleotide base pairs which form the sugar-phosphate "double ladder" backbone of the DNA on a chromosome. Chromosomes are found in the nucleus of a cell. However, within DNA, there are "coding" sections of base pairs that are the "genes," and "introns" or intervening sequences that do not code for any human traits or characteristics, sometimes referred to as "junk" DNA. J. Butler, Forensic DNA Typing: Biology & Technology Behind STR Markers 13-17 (2001). Markers used for human identity testing are found in the DNA either between the genes or within genes and simply do not code for genetic variation. The location of "markers" in these highly polymorphic or variable regions is called a "locus" (plural "loci"), and a variant of the DNA sequence at a given locus on a chromosome is called an "allele." J. Butler, Forensic DNA Typing: Biology & Technology

01-06-2007

Behind STR Markers 13-17 (2001).

In its earliest form, DNA forensic technology focused upon those parts of the DNA molecule where there is a significant variation of base pair patterns. *People v. Miller*, 173 Ill. 2d 167, 184-85, 670 N.E.2d 721, 730 (1996). Identified and denominated "Variable Numbers of Tandem Repeats" (VNTRs), these areas of DNA are particularly convenient as markers for forensic identification because they contain a very large number of tandem repeat units of differing base pair lengths. National Research Council, The Evaluation of Forensic DNA Evidence 14 (1996). The VNTRs themselves are not genes, as they do not code for any particular human characteristic or trait. Rather, they are noncoding regions that produce no product and have no known effect on the person other than for forensic identification determination. National Research Council, The Evaluation of Forensic DNA Evidence 14 (1996).

Over the years, the technology evolved and now focuses on a class of polymorphisms in DNA called "Short Tandem Repeats" (STRs), which are even shorter in base pair length. STRs are readily amplified by a process known as "polymerase chain reaction" (PCR) technology. The number of repeats in STR markers can be highly variable among individuals which makes them particularly desirable for identification determinations. See J. Butler, Forensic DNA Typing: Biology & Technology Behind STR Markers 53 (2001). Like VNTRs, the current technology of STRs also focuses upon the small noncoding regions of the DNA molecule, or the "junk" DNA. The number of repeats of a specific STR sequence present at a given locus, combined over a designated number of loci, creates a unique DNA "profile" of an individual. J. Butler, Forensic

01-06-2007

DNA Typing: Biology & Technology Behind STR Markers 18 (2001).

From its inception, DNA profiling or testing has involved two distinct procedures or analyses. The first procedure is biological and goes toward identification to determine if there is a "match," a laboratory determination that the suspect cannot be excluded as the source of genetic material found at the crime scene or on the victim. See *People v. Watson*, 257 Ill. App. 3d 915, 930, 689 N.E.2d 634, 637 (1994), *aff'd on appeal after remand,* 214 Ill. 2d 271, 825 N.E.2d 257 (2005).

The second procedure, grounded in population genetic statistics, is employed only in the event of a nonexclusion utilizing a database to calculate the probability of a random "match." As the court in *Watson* explained, this analysis generates a statistical likelihood that an unrelated person chosen at random from a particular population could have the same DNA "profile" as the suspect. *Watson*, 257 Ill. App. 3d at 918-19, 629 N.E.2d at 637. At the time *Watson* was decided, the method of calculating these statistical probabilities had not yet been generally accepted in the relevant scientific community. Since then, however, the Illinois Supreme Court has held that the methodology at issue (the "product rule") in probability statistics had become generally accepted by experts and courts and accordingly is admissible. *Miller*, 173 Ill. 2d at 188-89, 670 N.E.2d at 731.

Population statistics databases have thus been employed as a valuable tool in the development of DNA profiling to establish the likelihood or probability of a "match" in a way that is meaningful as well as understandable to the trier of fact. Early on, in *People v. Miles*, 217 Ill. App. 3d 393, 404-05, 577 N.E.2d 477, 484-85 (1991), the court upheld the admissibility of

DNA forensic testing procedures as well as the use of a database to determine the statistical probability of a "match." The defendant's DNA was matched to samples from the crime scene, and then compared to information from the Cellmark laboratory's database to determine the likelihood of a random match to any other African-American in the community. *Miles*, 217 Ill. App. 3d at 404-05, 577 N.E.2d at 484-85.

Interestingly, statistical probability projections actually predate DNA profiling, particularly with regard to serology testing. In *People v. Contreras*, 246 Ill. App. 3d 502, 508, 615 N.E.2d 1261, 1266 (1993), a forensic geneticist testified that electrophoresis testing on samples taken from the defendant revealed a rare genetic variant that was likewise present in the crime scene evidence. In turn, population statistics databases were used to determine the frequency with which the variant occurred in the male Mexican-American population, of which the defendant was a part. The court upheld the admission of this testimony based on the threshold reliability of the population statistics databases. *Contreras*, 246 Ill. App. 3d at 511, 615 N.E.2d at 1268.

The use of population statistics databases thus evolved out of the necessity to estimate the random match probability of a possible source of a DNA profile occurring within the appropriate reference population. As the Illinois Supreme Court recognized in *Miller*: "For a match to be meaningful, a statistical analysis is required. The statistical analysis determines the frequency in which a match would occur in a database population." *Miller*, 173 Ill. 2d at 185, 670 N.E.2d at 730. The identity of the other profiles in the database is of no significance in calculating these random statistical probabilities.

In 1989, a working group sponsored by the Federal Bureau of Investigations (FBI) laboratory provided the framework for a combined DNA Index System among crime laboratories to share DNA profiles, much like the fingerprint matching system. Thereafter, the DNA Identification Act of 1994 formally authorized the FBI to maintain the Combined DNA Index System (CODIS) with input of DNA profiles from local, state and national levels. All three levels contain the convicted offender and casework indexes and the population data file. There are now 13 STR loci that are analyzed by the FBI and used for comparison of unknown profiles obtained from crime scene evidence with the known profiles in the database. Again, these markers "are in the non-coding regions of the DNA and are not known to have any association with a genetic disease or any other genetic predisposition." J. Butler, Forensic DNA Typing: Biology & Technology Behind STR Markers, 241-45 (2001). In the CODIS system, the profiles consist of a specimen identifier that references the originating forensic laboratory, together with the number of tandem repeats for each of the alleles comprising the 13 STR loci. CODIS does not contain any personal identity information, such as names, dates of birth, or social security numbers. J. Butler, Forensic DNA Typing: Biology & Technology Behind STR Markers 242 (2001).

In Illinois, through subsequent enactments, our legislature has recognized the distinction between the two procedures of biological testing of the sample and calculating the statistical probability of a random match. Section 116-3(a) of the Code of Criminal Procedure (725 ILCS 5/116-3(a) (West 2004)) provides that:

> "A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint or forensic DNA

testing, including comparison analysis of genetic marker groupings of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, to those of other forensic evidence, and to those maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections, on evidence that was secured in relation to the trial which resulted in his or her conviction, but which was not subject to the testing which is now requested because the technology for the testing was not available at the time of trial." 725 ILCS 5/116-3(a) (West 2004) (added by Pub. Act 90-141, §5, eff. January 1, 1998, and amended by Pub. Act 93-605, §15, eff. November 19, 2003).

Section 116-3 opened a door for convicted defendants who maintain their innocence to test genetic material capable of providing "new and dramatic evidence materially relevant to the question of the defendant's actual innocence." *People v. Henderson*, 343 Ill. App. 3d 1108, 1114, 799 N.E.2d 682, 688 (2003). As section 116-3(a) authorized "forensic DNA testing, including comparison of genetic marker groupings of the evidence," (730 ILCS 5/116-3(a) (West 2004)) it is readily apparent that the statute encompasses both the biological and genetic statistical probability components of DNA profiling. However, in later legislation, section 116-5 of the Code of Criminal Procedure, enabling a defendant to move for a DNA database search of genetic marker grouping comparisons, did not embrace the biological component, but solely the genetic analysis aspects of the science. The search may include the "genetic profile" of the defendant, the forensic evidence (secured in relation to the trial), or the genetic profiles of offenders that are maintained in the section 5-4-3(f) database. 725 ILCS 5/116-5(a) (West 2004).

Also, "[i]f requested by the defense, a defense representative shall be allowed to view any genetic marker grouping analysis conducted by the Department of State Police." 725 ILCS 5/116-5(c) (West 2004) (added by Pub. Act 93-605, §15, eff. November 19, 2003). By its language, the statute strictly limits this viewing to genetic marker analysis; that is, viewing the computerized patterns of the genetic marker groupings within the database, rather than the initial biological testing of the samples themselves.

Similarly, the terms DNA or genetic "profile" and "genetic marker grouping analysis" are used interchangeably in the statutory provisions relating to the DNA database. Section 5-4-3 of the Unified Code of Corrections, which requires the extraction of DNA samples for persons convicted of or found delinquent for certain offenses, uses the terms "genetic marker groups" and "genetic marker grouping analysis." 730 ILCS 5/5-4-3 (West 2004). Section 5-4-3(d-2) instructs that the samples obtained "shall thereafter be forwarded to the Illinois Department of State Police, Division of Forensic Services, for analysis and categorizing into *genetic marker groupings*," (emphasis added) and these "genetic marker groupings" shall be maintained by the Illinois Department of State Police, Division of Forensic Services. 730 ILCS 5/5-4-3 (d-2)(e) (West 2004). Additionally, section 5-4-3(f) provides that all genetic marker grouping analysis information shall be maintained "in a single State data base, which may be uploaded into a national database." 730 ILCS 5/5-4-3(f) (West 2004).

Moreover, contrary to respondent's assertions, procedures do indeed exist mandating the removal of individuals' names or other identifiers from the genetic marker groupings in the population statistics database. The Illinois State Police are directed by regulation to ensure

privacy protection in that the material stored for forensic purposes may be used for a population statistics database only "if personal identifying information is removed." 20 Ill. Adm. Code §1285.60(b) amended at 31 Ill. Reg. 9249, eff. June 12, 2007. The regulation underscores the fact that the population statistics database is maintained for the purpose of estimating allele frequencies within the referenced population after the initial biological determination of an ostensible "match." See J. Kimmelman, Risking Ethical Insolvency: A Survey of Trends in Criminal DNA Databanking, 28 J.L. Med. & Ethics 209, 211 (2000). We stress again that the science of DNA "fingerprinting" to obtain the profiles transmitted and ultimately included within the single database simply does not use those portions of a subject's DNA that actually code for genetic characteristics.

Of course, the presence of some identifying information within the Illinois State Police database of all DNA profiles is necessary to determine whether someone is included or excluded as the possible offender, otherwise there would be no way to identify to whom a profile belongs. The FBI's CODIS system turns to state and local crime laboratories for such identifying information in the event of a database match.

Turning to a direct analysis of the face of section 5-4-3(f)(iii), it is clear that the language of the statute itself and the statutory scheme show that this practical understanding and usage is what the legislature intended. "The cardinal rule of statutory interpretation, to which all other rules are subordinate, is to ascertain and give effect to the intent of the legislature." *People v. Maggette*, 195 Ill. 2d 336, 348, 747 N.E.2d 339, 346 (2001). A court must consider the entire statute and interpret each of its relevant parts together. *Paris v. Feder*, 179 Ill. 2d 173, 177, 688

N.E.2d 137, 139 (1997). Here, in looking at all relevant parts of the statute as a whole, it is apparent that but one database is used *inter alia* to identify or exclude potential suspects or offenders as well as for random statistical probability calculations.

By its terms, section 5-4-3(f)(iii) clearly manifests the legislative purpose delineated in the indexing statute. Thus, the enactment expressly limits the authorized uses of the genetic marker grouping analysis information to:

> "(i) valid law enforcement identification purposes and as required by the Federal
>
> Bureau of Investigation for participation in the National DNA database, (ii)
>
> technology validation purposes, (iii) a population statistics database, (iv) quality
>
> assurance purposes if personally identifying information is removed, (v) assisting
>
> in the defense of the criminally accused pursuant to Section 116-5 of the Code of
>
> Criminal Procedure of 1963, or (vi) identifying and assisting in the prosecution of
>
> a person who is suspected of committing a sexual assault as defined in Section 1a
>
> of the Sexual Assault Survivors Emergency Treatment Act." 730 ILCS 5/5-4-3(f)
>
> (West 2004).

The law enforcement purpose in maintaining the database as a means to identify or exclude suspects is further evidenced by the fact that the release of such information is only allowed to designated persons. The statute specifically provides:

> "The genetic marker grouping analysis information obtained pursuant to this Act
>
> shall be confidential and shall be released only to peace officers of the United States, of

other states or territories, of the insular possessions of the United States, of foreign countries duly authorized to receive the same, to all peace officers of the State of Illinois and to all prosecutorial agencies, and to defense counsel as provided by Section 116-5 of the Code of Criminal Procedure of 1963." 730 ILCS 5/5-4-3(f) (West 2004).

Thus, by this enactment, the legislature has codified the accepted forensic science uses of DNA profiling both in apprehending or excluding suspects and in calculating statistical probabilities of DNA profiles for use in criminal trials. The statute itself does not define the terms "genetic marker grouping analysis" and "population statistics database," perhaps because they are so commonly used and understood in the area of forensics and criminal law that the legislature deemed it unnecessary to define them. At any rate, the common understood meaning of these terms, the other statutory provisions and statutory scheme as a whole clarify their meaning.

Our supreme court has likewise placed its imprimatur on the statute in holding that the primary purpose of section 5-4-3 is the creation of a criminal DNA database. *Garvin*, 219 Ill. 2d at 119, 847 N.E.2d at 90. The appellate courts have also recognized that "[t]he statute's primary purpose is to create and maintain a database that can be used to identify felons and compare samples taken from crime scenes to convict or exonerate individuals." *People v. Edwards*, 353 Ill. App. 3d 475, 486, 818 N.E.2d 814, 821 (2004).

Further, the statute provides additional protection in that use of the "genetic marker grouping analysis information, or any other information derived from a DNA sample, beyond the

authorized uses as provided under this Section, or any other Illinois law, is guilty of a Class 4 felony, and shall be subject to a fine of not less than $5,000." 730 ILCS 5/5-4-3(f-5) (West 2004). Clearly, the statute limits the use of its single DNA database to the purposes set forth in the enactment. Moreover, the legislative recognition and authorized use of the population statistics database is again simply a universal facet of DNA profiling allowing for the calculation of statistical probability estimates when DNA evidence is admitted in criminal trials.

In summary, respondent's alleged fear of the use of the population statistics database for monitoring personal information, for unauthorized "behavioral research" or to discriminate against certain individuals or groups is manifestly groundless. As courts have recognized, "[n]owhere in section 5-4-3 is the gathering of 'uniquely private genetic facts' authorized." *People v. Butler*, 354 Ill. App. 3d 57, 68, 819 N.E.2d 1133, 1141 (2004). All 50 states and the federal government have adopted genetic marker testing and storage statutes similar to the one here in Illinois, and rejected constitutional challenges. See *People v. Garvin*, 349 Ill. App. 3d 845, 853-54, 812 N.E.2d 773 (2004) (statutes cited therein). Therefore, respondent's facial constitutional challenge to the statute under the Illinois Constitution's privacy clause must fail.

Lastly, we reject respondent's argument that the lack of an anonymity provision for the population statistics database under section 5-4-3(f)(iii) renders the statute unconstitutional for this reason. As the court in *Edwards* recognized, "the State has a strong interest in obtaining reliable DNA identification evidence and in properly identifying convicted felons." *Edwards*, 353 Ill. App. 3d at 483, 818 N.E.2d at 821. In practical application, the presence of limited identifying information within the crime laboratory is necessary for identifying or excluding

possible offenders, and, as we explained above, the Illinois State Police regulation mandates that genetic marker grouping information may be used in the population statistics database only if all personal identifying information is removed. Therefore, respondent's facial challenge to the statute on this additional basis also fails. Moreover, she has not shown that the statute is invalid under any set of circumstances. See *Garvin*, 219 Ill. 2d at 117, 847 N.E.2d at 89.

## CONCLUSION

Respondent has failed to provide meaningful support for her contentions on appeal, with the exception of the modification of the term of her probation. Accordingly, we affirm the judgment of the circuit court of Cook County but modify the term of respondent's probation and supervision to terminate on June 20, 2010.

Affirmed as modified.

FITZGERALD SMITH, P.J., with O'MARA FROSSARD, J., concur.

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**

**(Front Sheet to be Attached to Each Case)**

Please use the following form

*In re* **Jessica M., a Minor**

**(The People of the State of Illinois,**

**Petitioner-Appellee,**

**v.**

**Jessica M., a Minor,**

**Respondent-Appellant).**

| | |
|---|---|
| Docket No. | No.   1-06-2007 |
| | Appellate Court of Illinois |
| COURT | First District, FIFTH Division |
| Opinion | |
| Filed | October 17, 2008 |
| | (Give month, day and year) |

JUSTICE MICHAEL P. TOOMIN DELIVERED THE OPINION OF THE COURT:

JUSTICES FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

Lower Court and Trial Judge(s) in form indicated in margin:

APPEAL from the Circuit Court of Cook County; the Hon_____ Judge Presiding.

Appeal from the Circuit Court of Cook County.

The Hon. **NOREEN M. DALY,**  Judge presiding.

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel.  Indicate the word or FOR APPELLANTS NONE if not represented.

John Doe, of Chicago

01-06-2007

For APPELLEES,           :                    APPELLANT: OFFICE OF THE STATE APPELLATE DEFENDER, Chicago, IL
Michael J. Pelletier, Deputy Defender; Justyna Garbaczewska, Assistant Appellate
Defender

Smith and Smith of

Chicago,                          APPELLEE: STATE'S ATTORNEY, COUNTY OF COOK, Chicago, IL Richard A. Devine, State's Attorney;
James                            E. Fitzgerald, Douglas Harvath, Brian K. Hodes, Assistant State's Attorneys

(Joseph Brown, of counsel)

Add attorneys for third-

party appellants and/or

appellees.