# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Wright, 2012 IL App (1st) 073106**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HARVEY WRIGHT, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-07-3106, 1-07-3464 cons. |
| Filed | March 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated criminal sexual assault based primarily on a cold-case DNA match was reversed and the cause was remanded for a new trial on the ground that the trial court abused its discretion in denying defendant's motion to require the Illinois State Police to conduct a nine-loci database search to determine the number of nine-loci DNA matches in its offender database, especially in view of the conflicting evidence concerning the DNA analysis employed in defendant's case. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-16608; the Hon. John J. Fleming, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Patricia Unsinn, and Scott F. Main, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Mary Needham, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justice J. Gordon concurred in the judgment and opinion.

Justice McBride dissented, with opinion.

## OPINION

¶ 1     This is a case of first impression. This case involves a criminal defendant's *pretrial* motion for a DNA database search. As far as we know, this is the first case to review a trial court's denial of a motion governed by section 116-5 of the Illinois Code of Criminal Procedure of 1963, the Illinois statute that permits criminal defendants to seek pretrial DNA database searches. 725 ILCS 5/116-5 (West 2006). In addition, "Illinois is one of the few states in the nation to provide a statutory framework" for a criminal defendant who seeks pretrial access to the state's DNA database. Erin Murphy, *The New Forensics: Criminal Justice, False Certainty and the Second Generation of Scientific Evidence*, 95 Calif. L. Rev. 721, 790-91 (2007). Compare with *State v. Dwyer*, 2009 ME 127, ¶ 16, 985 A.2d 469 (since there is no specific statute in Maine authorizing pretrial DNA database searches, a pretrial search motion was decided solely on general evidentiary principles).

¶ 2     Defendant Harvey Wright was prosecuted almost entirely on the basis of a cold-case DNA match. He was convicted of aggravated criminal sexual assault after a jury trial and sentenced to life in prison, although the victim could not identify him as the perpetrator, and there was no other physical evidence linking him to the crime.

¶ 3     Two DNA samples were recovered: from the victim's underwear and from the victim's rectal swab. The State's forensic expert testified that only the rectal sample yielded a "match" to defendant's DNA. However, the analysis of the rectal swabs was done on the basis of only 9 loci, instead of the more standard 13 loci. For the underwear, the analysis was done on the basis of 13 loci; but from the analysis of the underwear, the expert could not find a "match"; he could conclude only that defendant could not be excluded as a contributor.

¶ 4     On appeal, defendant claims that the trial court erred by denying his pretrial motion to have the Illinois Department of State Police determine the number of nine-loci DNA matches in its offender database. Defendant also makes several other claims, including that the State failed to prove beyond a reasonable doubt that defendant "acted in such a manner as to threaten or endanger the life" of the alleged victim. 720 ILCS 5/12-14(a)(3) (West 1998). In

its appellate brief, the State concedes: "The People agree that they failed to prove beyond a reasonable doubt the aggravating factor alleged."

¶ 5    For the reasons stated below, we find that the trial court erred, and we reverse and remand for a new trial.

¶ 6                                    BACKGROUND
¶ 7                          1. Defendant's Pretrial DNA Motion
¶ 8    On June 12, 2006, defendant moved to exclude any DNA evidence obtained from the State's analysis of the victim's rectal swabs. Defendant's motion stated that the analysis of the rectal swabs was done on the basis of only 9 loci and DNA analysis is typically done on the basis of 13 loci. His motion stated that, normally, "two kits" are used "to develop the DNA profile," and the two kits are called "Profiler" and "Cofiler." Profiler develops "nine locations on the human genome, and Cofiler can develop the four additional locations necessary in developing a full profile." Defendant's motion stated that, "[a]ccording to the paperwork in the case file," the DNA extracted from the rectal swabs was quantified and amplified using both Profiler and Cofiler, but "there [are] no electronic data or paper printouts from any Cofiler" runs.

¶ 9    Defendant's motion stated that Michael DeFranco, the forensic scientist who extracted the DNA from the rectal swabs, left the employ of the Illinois State Police, and Edgar Jove, the new scientist assigned to the case, "noticed this discrepancy in the Cofiler materials, and decided to get the DNA extract in the case to reamplify the DNA in Cofiler for the rectal swabs." However, Jove "located the tube where the extract should have been, and there was nothing in the tube." Later at trial, Jove testified that there were no rectal swabs left to test, because "[a]ll four swabs were consumed in the original extraction."

¶ 10   Defendant moved to exclude the DNA evidence from the rectal swabs, pursuant to Illinois Supreme Court Rule 417(b)(i) (eff. Mar. 1, 2001), which requires the proponent of DNA evidence to provide to the adverse party copies of "the case file," including all reports and data relating to the testing performed. Since the State failed to produce the data from DeFranco's Cofiler testing of the rectal swabs, defendant sought to exclude any DNA evidence obtained from the rectal swabs.

¶ 11   In the alternative, defendant's motion asked that, if the trial court ruled to admit the nine-loci evidence, then it should order the State to determine how many nine-loci "matches there are in [the State's] convicted database." In support of his alternative argument, defendant cited an Arizona study, stating:

> "[A] recent examination of Arizona's convicted offender database revealed 120 nine location matches between two inmates in a database of 65,493 offenders. In other words, in Arizona there is a 1 in 700 chance that two individuals will match up at nine locations."

Defendant argued that in order to have "a match," the samples had to match at 13 loci and that anything less was not a match. Defense counsel stated that, "to [their] knowledge, no study has been performed to determine how many nine loci matches are present in the Illinois

database." Defendant asserted that "[p]erforming such a study would give perspective to the strength of the partial profile match developed in this case" and would support defendant's argument that a 13-loci analysis was required.

¶ 12 In his motion, defendant did not ask for the names, addresses, or any identifying information for any DNA profiles that matched his profile at nine loci in the State's offender database. Defendant asked only for the number of profile pairs that were the same at nine loci.

¶ 13 In its response to defendant's motion, the State claimed: "The State has much more evidence against the Defendant than this one swab, including [1] a swab from the Victim's underwear that matches the Defendant at all 13 loci, and [2] additional testing is currently underway on swabs that were taken from the Victim's vaginal area."

¶ 14 Contrary to what the State asserted in its response, one of the State's forensic experts at trial testified that the DNA from the victim's underwear was not a match to defendant's DNA. As will be discussed more fully below, the expert could conclude only that defendant could *not* be excluded as a contributor. At trial, the State explained that, even though 13 loci were considered with respect to the underwear, the sample did not yield "a full profile." He testified that the sample yielded only "some of the loci." In addition, for some of the loci, the expert found that there were "different possibilities." The expert testified that, by using "all possible combinations for that particular area of the DNA," he found that "[a]pproximately one in 5 point 4 quadrillion black, one in 4 point 3 quadrillion white, or one in 66 quadrillion Hispanic unrelated individuals cannot be excluded as the male contributors." At trial, the State's expert observed that these numbers were much higher than the population of the earth. In addition, contrary to the State's prediction about the vaginal swab, one of the State's experts at trial testified that analysis of the victim's vaginal swabs did not yield a male DNA profile.

¶ 15 The State's response also claimed that defendant had failed to provide it with a copy of the Arizona study and that Illinois Supreme Court Rule 417 (eff. Mar. 1, 2001) did not apply to the case at bar, because it went into effect on March 1, 2001, which was after the date that tests on the rectal swabs and underwear were performed. As noted above, Rule 417(b)(i) requires the proponent of DNA evidence to provide to the adverse party copies of "the case file," including all reports and data relating to the testing performed. Ill. S. Ct. R. 417(b)(i) (eff. Mar. 1, 2001). Since the State failed to produce the data from DeFranco's Cofiler testing of the rectal swabs, defendant sought to exclude any DNA evidence obtained from the rectal swabs.

¶ 16 On August 18, 2006, defendant filed a "supplemental" motion. In this response, defendant argued that Rule 417 applied because the case was still in the pretrial stage. Defendant also stated that he had previously provided a copy of the Arizona study to Edgar Jove, the State's DNA expert. In addition, defendant attached a copy of the five-page Arizona report. The report is entitled "9+ Locus Match Summary Report," and it states that it was prepared as a special report by the Arizona Department of Public Safety, pursuant to court order. The study lists matches, match by match, that occurred at 9, 10, 11 and 12 loci. The report states that the matches that occurred at 11 and 12 loci are siblings. The report states

that any relationship between the 9-loci matches and the 10-loci matches "has not been determined." The report lists each individual pair that matched, with identifying numbers for each one in the pair.

¶ 17 The report lists: 122 pairs that matched at 9 loci; 20 pairs that matched at 10 loci; only 1 pair that matched at 11 loci; and only 1 pair that matched at 12 loci. The grand total was 144 matches. Subtracting the siblings that matched at 11 and 12 loci leaves a total of 142 matches.

¶ 18 On February 8, 2007, the trial court heard argument on defendant's motion. Defense counsel informed the court, "[b]asically, your Honor, we will just go on the pleadings." Concerning the nine-loci match, defense counsel stated: "[W]e have to seem to learn [*sic*] that 9 loci matches are not completely uncommon, this would deprive [defendant] of a fair trial, particularly because this is the only evidence against him, this 9 loci match." The prosecutor immediately responded with "[t]hat's not true," and the trial court interjected: "All right. I read the motion." The trial court then stated that defendant's "motion to exclude evidence based on the destruction of evidence" was denied. Defense counsel then pointed out that there were two filings, so that "the Appellate Court will know" defendant intended to discuss both on appeal. The filing on June 12, 2006, set forth both the motion to exclude and the argument in the alternative for a database search; and the supplemental filing on August 18, 2006, which responded to the State's arguments and provided the full Arizona report. The trial court indicated that it had read both documents and that its ruling included both.

¶ 19 After his motion was denied, the defense strategy switched to a consent defense. Defendant had previously filed an answer to the State's discovery request, and his original answer, filed on June 12, 2006, did not allege a consent defense. However, after the trial court's ruling, defendant amended his answer, on June 25, 2007, in order to include a consent defense. His counsel later argued a consent defense in both his opening and closing statements at trial.

¶ 20 2. State's Evidence at Trial

¶ 21 The four-day trial began on June 25, 2007, with jury selection and ended with a verdict of guilty on June 28, 2007. At trial, the State called 11 witnesses. The first witness was the victim, age 24 years old, who had been only 15 years old at the time of the offense and who was unable at trial to identify defendant as the perpetrator. Although the victim was 15 years old at the time of the offense, the State's indictment of defendant made no charges relating to the victim's age.

¶ 22 Five of the State's witnesses were DNA forensic scientists: (1) Therese Biogard, who received from the Chicago police a buccal swab kit[1] for defendant and who took actions to preserve the DNA material; (2) Jamie Gibson, who generated a DNA profile from the

[1]Officer Thaddeus Hajduk, who obtained the buccal sample from defendant, testified at trial concerning what a buccal sample is: "A buccal sample is obtained on two Q-tips by rubbing the inside of your mouth and obtaining saliva and then is submitted for analysis."

-5-

material recovered from defendant's buccal swab; (3) Brian Schoon, who testified that his analysis of the victim's vaginal swabs did not yield a male DNA profile although semen was present; (4) Michael DeFranco, who generated DNA profiles from the material recovered from the victim's underwear, rectal swabs, and blood standard; and (5) Edgar Jove, who compared the DNA profile generated for defendant with the DNA profiles generated from the samples recovered from the victim's underwear and rectal swabs.

¶ 23        The State's remaining witnesses were: (1) Angela Halpin, the emergency room nurse who examined the victim immediately after the offense and completed a rape kit; (2) Officer Richard Samanas, the evidence technician who retrieved the completed rape kit from the hospital; (3) Officer Thaddeus Hajduk, the evidence technician who obtained the buccal sample from defendant; (4) Detective Kupczyk, who interviewed the victim; and (5) Argentry Dean, the security guard at the bus station whom the victim approached after the offense.

¶ 24        The parties entered into two stipulations, which were read to the jury as part of the State's case-in-chief. First, the parties stipulated that Jennifer Schultz, a forensic DNA scientist, received the victim's rape kit, which contained the victim's underwear and blood standard, and her vaginal, oral and rectal swabs. If called as a witness, Schultz would testify that semen was found on the underwear and on the vaginal and rectal swabs but not on the oral swabs. Schultz would further testify that "she preserved these swabs for future DNA analysis." Second, the parties stipulated to defendant's address on October 12, 1998.

¶ 25                          3. Victim's Testimony

¶ 26        The victim, who could not identify defendant as the perpetrator, testified about the following events during her direct examination at trial. At the time of trial, she was 24. When she was 15 years old, she traveled with her mother and sisters by automobile to visit her aunt in Iowa. However, when they returned to New York, they left without her. She stayed in Iowa and later returned by Greyhound bus on September 26, 1998. She was en route by bus from Iowa to New York, when she had a two-hour layover in Chicago, starting at approximately 9 p.m. At the Chicago bus station, she approached strangers asking where she could buy a snack, when a man told her to follow him.

¶ 27        The victim testified that she walked with the man, out of the station for a number of blocks to his apartment, which was on the first floor of a two-family house. The walk lasted about a half-hour. At the house, a woman in the living room was watching television, and the victim walked past the woman and followed the man into a bedroom. The victim said nothing to the woman as she walked past, and the man closed and locked the bedroom door behind them. In the bedroom, she had vaginal sex twice and oral sex twice with the man.

¶ 28        The victim testified that the man then walked her back to the bus station, where he asked a security guard when the next bus to New York was leaving. At that point, she said nothing to the security guard. After the guard informed the man that the next bus to New York was leaving in an hour, she followed the man outside to an alley, where they had vaginal intercourse again. As he was putting his clothes back on, she ran from him, leaving her travel bag behind in the alley. She had carried her travel bag to his apartment and back to the bus

station, but she left it in the alley. When she entered the bus station, she approached the same security guard who had previously spoken with the man, and she told him that "the guy I was with" had raped her. She testified that none of the sexual acts had been consensual.

¶ 29　The victim testified that when the police arrived, she told them what had happened and they took her to a hospital emergency room, where she was examined by a doctor and a nurse. The examination included swabs of her vagina, mouth and rectum. The victim also informed the nurse what had happened. The victim also testified that she had washed her underwear "a couple of days before that" night. After the hospital examination, police officers drove her around, but they could not locate the man's residence. They did locate the alley. Eventually, she boarded a bus and returned home.

¶ 30　The victim testified that, years later, in May 2004, she met in Brooklyn with a Chicago police detective and an assistant State's Attorney. Concerning the perpetrator, she testified: "I just remember a scar he had on his face. I don't even remember what he really looked like. I just try to black it out. It was so many years ago."

¶ 31　On cross-examination, the victim testified that she did not return to New York with her mother and sisters because she "went to hang out with an ex-boyfriend and a couple of friends." She left her aunt's house and did not tell anyone where she was going. She stayed in Iowa, because she was having problems with her mother. She admitted that she had run away a lot. After she returned to her aunt's house, her aunt told her that she had to leave because she refused to follow her aunt's rules.

¶ 32　On cross-examination, the victim admitted that, before she first spoke to the perpetrator, a woman at the train station informed her that there was a grocery store nearby, at a college. The victim had previously relayed this information to the detective. The victim testified that she left the bus station, because "there was like no junk food, stuff that I wanted." However, she admitted that she thought there was a restaurant and vending machines at the bus station. She testified that she was looking for "[j]ust a grocery store." She thought that she had left the bus station and started walking toward the university, when the perpetrator approached her. She told him what kind of junk food she wanted and he told her he would take her to a store.

¶ 33　　　　　　　　　　4. Testimony by DNA Comparison Expert

¶ 34　Edgar Jove testified that he was a "DNA group supervisor" at the Illinois State Police Forensic Science Center in Chicago, where he had been employed over 11 years. After the prosecutor stated that he was "tender[ing] the witness as an expert in the field of forensic DNA analysis," the trial court offered defense counsel an opportunity to question the expert which counsel declined. The trial court then stated "okay" and the State's questioning resumed.

¶ 35　On direct examination, Jove testified that he made two comparisons in the case at bar. Specifically, he compared DNA data recovered from defendant's buccal swab with DNA data recovered from (1) the victim's underwear and (2) the victim's rectal swabs.

¶ 36　Jove testified that, in making his comparisons, he utilized data generated by other forensic scientists employed by the Illinois State Police. He received the notes and the DNA

profiles generated by Michael DeFranco, a previous DNA analyst, before DeFranco left the employ of the Illinois State Police. This DNA data included data from the victim's blood standard, her rectal swabs and her underwear, which had been processed by DeFranco in approximately 1998. Jove testified that he also received DNA data from defendant's buccal swab, which had been processed by Jamie Gibson, another forensic scientist.

¶ 37　　Jove testified generally about DNA analysis, explaining that if there is "enough DNA, we look at 13 different areas of DNA" or loci. To identify all 13 loci, a scientist "run[s] two systems." He explained that "[t]he first system has nine different areas of the DNA, plus another area that will determine the sex of the donor, and then the second system will have four areas of the DNA."

¶ 38　　In the case at bar, Jove testified first about DNA recovered from the victim's rectal swabs, and then about DNA recovered from the victim's underwear. For the victim's rectal swabs, the notes that Jove received from DeFranco provided results only from the first system, and thus provided only 9 loci, rather than the full 13 loci. Jove testified that, in his opinion, the second test had simply never been run on the rectal swabs. (However, on cross, Jove admitted that he was not certain whether the second test had never been run or whether the data from the test had been destroyed.)

¶ 39　　Jove testified that the victim's rectal swabs contained DNA from two individuals, one male and one female. Jove stated that it was common to find the victim's own DNA on her own rectal swab. Jove testified that "[a]ssuming the mixture of human DNA profile identified in the rectal swab is a mixture of [the victim's] and one other individual, a male [nine-loci] DNA profile was identified which matches the DNA profile of [defendant] Harvey Wright." Jove testified that the frequency with which he would expect to see this nine-loci male DNA profile occurring in the general population was "approximately one in 420 trillion black[s], one in 670 trillion white[s], or one in 2 point 9 quadrillion Hispanic unrelated individuals."

¶ 40　　Jove did not testify whether, to generate these numbers, he used the FBI's database, the Illinois database, some combination of the two, or some other population database altogether. Compare *In re Jessica M.*, 399 Ill. App. 3d 730, 748 (2010) ("but one database is used" in Illinois "to identify or exclude potential suspects or offenders as well as for random statistical probability calculations"), with *Dwyer*, 2009 ME 127, ¶ 15, 985 A.2d 469 (in Maine, DNA probability calculations are produced by " 'using FBI population studies,' " as well as " 'limited information from the Maine database' ").

¶ 41　　Jove testified next about the DNA recovered from the victim's underwear, stating that this DNA was a mixture from three people. There was a greater amount of DNA from two of the three people than from the third. Of the two major contributors, one was a female and one was a male. However, Jove could not identify the gender of the third and minor contributor, and this third profile was too "limited" to make any comparisons. Concerning the DNA recovered from the underwear, Jove testified "[a]ssuming [the victim] is one of the major human DNA profiles, an additional male human DNA profile was identified from which [defendant] Harvey Wright cannot be excluded."

¶ 42　　On direct examination, Jove clarified that, while he had used the term "match" with

respect to the 9-loci analysis on the rectal swab, he could not reach that same conclusion with respect to the 13-loci analysis on the underwear. With the underwear, Jove could conclude only that [defendant] Wright could "not be excluded"; however, there was no match.

¶ 43     During cross-examination, in response to a question asked by the trial court, Jove indicated that, in his experience, he had never seen a nine-profile match that was not accurate. The trial court then barred defense counsel from asking any follow-up questions about the Arizona study, which had been provided to Jove prior to trial and which had revealed over a hundred pairs of nine-loci matches:

"THE TRIAL COURT: –is there a possibility that by running those other, the second part of the test, that the result would have been different? Could he have been excluded?

JOVE: In my experience, I haven't seen–in my casework, I haven't seen a nine loci match at the profiler system, the first system, and then have an exclusion. I haven't seen that in my casework.

DEFENSE COUNSEL: Okay. You were interviewed by attorneys from our office regarding this case?

JOVE: Yeah.

DEFENSE COUNSEL: Okay. You were interviewed by an attorney named Andrew Northrup.

JOVE: Yes, I was.

DEFENSE COUNSEL: Mr. Northrup gave you a study from the Arizona database–

PROSECUTOR: Objection.

DEFENSE COUNSEL: –regarding the nine loci matches.

THE COURT: I believe we've had motions in limine on this issue."

¶ 44     During cross-examination, Jove testified that, when he discovered that the second test had not been run on the rectal swabs, he examined the tube which had contained the swabs to see if there was any liquid left to test. Jove testified that, according to the last analyst who stored the tube, there was DNA left in the tube. But when Jove found the tube, it was empty. However, Jove admitted that it was possible that he could have added some sort of liquid or other medium to the tube to determine if there was additional DNA left and that he did not do that.

¶ 45     During cross-examination, Jove testified that the third contributor to the underwear stain could have been male. On redirect examination, the prosecutor elicited that the DNA from the third contributor could have been there for weeks, if the underwear had not been washed.


¶ 46                    5. Conviction, Posttrial Motions and Sentencing

¶ 47     On June 27, 2007, the State rested, and the defense rested without offering evidence. After listening to jury instructions, the jury went home for the day. On June 28, after hearing closing arguments from both sides, the jury found defendant guilty of "aggravated criminal sexual assault, oral" and "aggravated criminal sexual assault, vaginal."

¶ 48     On July 26, 2007, defendant filed a posttrial motion for a new trial, followed by a

supplemental motion on October 15, 2007. In the supplemental motion, defendant claimed that the trial court had erred in denying his motion relating to the "destruction of [DNA] evidence in violation of Supreme Court Rule 417." On October 15, 2007, the trial court denied defendant's posttrial motions for a new trial and sentenced defendant to natural life in prison, without parole. Defendant's motion to reconsider sentence was denied on October 29, 2007, and a notice of appeal was filed on October 30, 2007.

¶ 49　　On November 2, 2007, defendant filed a *pro se* motion entitled: "A Add On Motion for a New Trial." With respect to the DNA motion, the *pro se* motion stated:

> "8. Defendant states there were two DNA samples found on the victim. But the police nor the state's attorney tried to find out where this other sample came from. The state also failed to preserve these samples for testing. For the defense, be it intentional or not, the state has the obligation to prove innocence or guilt, citing *State v. Mitchell*, 140 Ariz. 551.

> \* \* \*

> 13. Defendant states that trial counsel [name] was ineffective when he refused to have the DNA Andrew Northup, who wrote the motion to suppress the DNA evidence, to appear in court to explain his own reasons for filing the motion. Had Andrew Northrup would have argue [*sic*] his own motion, things would have been different.

> 14. Defendant states that trial counsel [name] was ineffective when he refuse [*sic*] to have a [*sic*] independent DNA test done, after defendant advised attorney that there was some misconduct on the part of Detective Kupczyk and the state attorney when handle [*sic*] the initial arrest on 4-6-2003 which lead up [*sic*] to this cause. I also informed trial attorney that this issue has never been addressed. Had attorney would have did [*sic*] so, defendant['s] trial would have been different."

On November 14, 2007, the trial court denied defendant's *pro se* motion for a new trial. Although the trial judge stated that he did not believe that defendant's motion had sufficiently alleged claims of ineffective assistance of counsel, the judge stated that he was "going to deny it as being late." A second notice of appeal was subsequently filed on December 4, 2007. The appellate court then consolidated the two appeals on November 7, 2008, and this consolidated appeal followed.


¶ 50　　　　　　　　　　　　　　6. Supplemental Record

¶ 51　　On page 23 of the appellate brief filed by the State Appellate Defender on defendant's behalf, defendant stated that a "test was run by the Illinois State Police in *People v. Juan Luna*, No. 02 CR 15430" to determine the number of entries in its offender database that will appear identical at only 9-loci, and that this test found 903 pairs occurring at 9 or more loci, out of the 220,456 offender profiles. On December 31, 2009, this court ordered defendant to supplement the record "with the portions of the *Luna* record which will substantiate" the statement in his appellate brief about the prior search of the Illinois database. See *People v. McKown*, 226 Ill. 2d 245, 258-59 (2007) (permitting an appellate court, when evaluating a trial court's ruling concerning scientific evidence, to consider scientific information outside of the existing record). The State made no objection to this order.

¶ 52    On January 8, 2010, defendant supplemented the appellate record with (1) the evidentiary deposition of Donald Parker, the administrator of the Illinois DNA offender database, who was responsible for the search of the Illinois offender database in August 2006 for nine-loci pairs; and (2) the trial testimony of defense expert Karl Reich and State expert Ranajit Chakraborty, who analyzed the findings of the nine-loci test run by the Illinois State Police. The evidentiary deposition occurred on October 17, 2006, and the trial testimony occurred in May 2007.

¶ 53    Parker, the administrator in charge of our state's offender database, testified at his deposition that, in his opinion, "[i]f it doesn't match across the thirteen loci, then it's not a true match." Parker stated repeatedly that nine-loci comparisons are "not true matches" and that "[i]t's misleading to call them matches." Parker testified that he started with the Illinois State Police as a forensic scientist trainee in April 1995, and then he rose through the ranks, until he became the administrator of the state's DNA offender database in 2005. His educational background was in microbiology, and he received training and classes in DNA analysis and statistics from the State Police. In 1997, he was selected by the directors of the Chicago crime forensic science center to be part of the State's validation team to analyze a new type of DNA analysis, namely, STR testing. Parker was part of the group that published an article on the team's results in the Journal of Forensic Sciences. Parker testified that he had been qualified many times in court as an expert in DNA analysis. When he "testified in court, it [was] to give a probability or an odds to a profile."

¶ 54    Parker testified that, in response to an order by the trial court in the *Luna* case, he ran a search of the Illinois database to determine how many pairs of matches it contained at only nine loci. Parker was aware that the defense request in the *Luna* case was based, in part, on a similar search that had been done of the Arizona database. At the time of the *Luna* search, the Illinois database contained 220,456 DNA profiles, and all the profiles contained 13 or more loci. The database search revealed 903 pairs of individuals who matched at only 9 loci. In other words, 1,806 individuals had the same alleles at 9 loci as at least one other individual in the database. Parker testified that "[i]f you look[ed] at the further loci, they would be considered nonmatches." In other words, after the "match" at nine-loci, a further review of the other four loci on each individual would show that there was really no match.

¶ 55                                    ANALYSIS

¶ 56    On this direct appeal, defendant makes several claims. He claims that the trial court erred (1) by failing to order the Illinois State Police to determine the number of nine-loci matches in its offender database; (2) by barring defense counsel from asking the State's DNA expert any questions about a similar search of the Arizona offender database; (3) by admitting the victim's out-of-court statements recounting the alleged offense to a nurse; and (4) by admitting a photograph of another alleged victim of a sexual assault by defendant. Defendant also claims that the prosecutor committed misconduct by telling the jury that "the State knows the defendant is guilty." Defendant also asks us to remand, on the ground that the trial court failed to inquire adequately into defendant's *pro se* claims of ineffective assistance of counsel.

¶ 57    Last but not least, defendant asks this court to reduce his conviction from aggravated criminal sexual assault to sexual assault, because the State allegedly failed to prove guilt on the aggravating element, namely, that defendant "acted in such a manner as to threaten or endanger the life" of the alleged victim. 720 ILCS 5/12-14(a)(3) (West 1998). In its appellate brief, the State concedes: "The People agree that they failed to prove beyond a reasonable doubt the aggravating factor alleged."

¶ 58    For the reasons discussed below, we find, first, that the trial court erred by failing to order a DNA database search; second, that defendant received ineffective assistance of counsel; and third, that the trial court erred by barring defense counsel from asking the State's DNA expert questions about a similar search of the Arizona offender database. Since we reverse and remand on these grounds, we do not reach defendant's remaining claims.

¶ 59                                1. Standard of Review

¶ 60    We find that our standard of review is abuse of discretion, based on our consideration of the statute at issue and of evidence law, in general.

¶ 61    The statute at issue is section 116-5 of the Illinois Code of Criminal Procedure. 725 ILCS 5/116-5 (West 2006). This statute governed defendant's motion for a pretrial DNA database search. Section 116-5 states, in relevant part, that "[u]pon motion by a defendant charged with any offense where DNA evidence may be material to the defense investigation or relevant at trial, a court may order a DNA database search by the Department of State Police." 725 ILCS 5/116-5 (West 2006).

¶ 62    The statute took effect on November 19, 2003, and there are no published opinions that discuss the appropriate standard of review for a trial court's denial of a defense motion. However, the statute itself states that the trial court "may" order a DNA database search. As our supreme court has stated many times, the job of a reviewing court in construing a statute is to give effect to the legislature's intent, and the best indication of the legislature's intent is the language it chose to use in the statute. *E.g., People v. Cardamone*, 232 Ill. 2d 504, 512 (2009). The word "may" indicates that the legislature intended to leave, to the sound discretion of the trial judge, the grant or denial of the requested search. *People v. Garstecki*, 234 Ill. 2d 430, 443 (2009) (use of the word "may" indicates that a rule is "permissive"). In addition, evidentiary rulings are generally reviewed only for an abuse of discretion. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1105 (2009).

¶ 63    However, defendant claims that our review should be *de novo*, "because the trial court is in no better position than a reviewing court to decide the merits of the motion" for a DNA database search. In support of his argument, defendant cites the Illinois Supreme Court's opinion in *People v. Shum*, 207 Ill. 2d 47, 65 (2003).

¶ 64    The statute at issue in *Shum* was the statute that allows a defendant, after he has already been convicted, to move the trial court for postconviction DNA testing. *Shum*, 207 Ill. 2d at 64 (quoting 725 ILCS 5/116-3 (West 2000)). The statute sets forth detailed criteria for a trial court to consider and states that the trial court " 'shall' " allow the requested testing after a " 'determination' " that the listed criteria are satisfied. *Shum*, 207 Ill. 2d at 64 (quoting 725 ILCS 5/116-3 (West 2000)). It is well established, under Illinois case law, that an appellate

court will review *de novo* a trial court's denial of a defendant's postconviction motion made pursuant to section 116-3. *Shum*, 207 Ill. 2d at 65; *People v. Franks*, 323 Ill. App. 3d 660, 662 (2001); *People v. Urioste*, 316 Ill. App. 3d 307, 310 (2000).

¶ 65 However, we are not persuaded by the line of cases decided under the postconviction statute, since the postconviction and the pretrial statutes are different. First, the postconviction statute uses the word "shall," and the pretrial statute uses the word "may." The difference in language indicates that the pretrial statute is discretionary while the postconviction statute is not. *Garstecki*, 234 Ill. 2d at 443 (the effect of "change from 'may' to 'shall' " was "to change the rule from a permissive one to a mandatory one"); *People v. Walker*, 392 Ill. App. 3d 277, 295 (2009) ("use of the word 'shall' indicates a 'mandatory' requirement"). Second, the postconviction statute sets forth a detailed list of criteria that a trial court must consider. By contrast, the pretrial statute sets forth no criteria. The lack of criteria in the pretrial statute is additional evidence that the legislature intended to leave the decision of the pretrial motion up to the trial court's discretion.

¶ 66 For the foregoing reasons, we find that, for a trial court's denial of a defendant's section 116-5 motion, abuse of discretion is the appropriate standard of review. 725 ILCS 5/116-5 (West 2006). However, no matter which standard of review we used, our decision in this case would be the same.

¶ 67                                 2. Forfeiture Issues

¶ 68 In the case at bar, the State claims that defendant forfeited this issue for appellate review by failing to obtain a ruling on his motion.

¶ 69 In the case at bar, defendant's pretrial DNA motion asked the trial court to exclude the DNA evidence and then argued in the alternative for a DNA database search. During the argument on the motion, defense counsel stated that he would rest primarily on his "pleadings." When the trial court denied his motion, the trial court indicated that it had read all the defendant's filings pertaining to defendant's DNA motion. This case is completely different from a case where an entire filing slips through the cracks after the case is transferred to another judge and where the new judge issues no ruling on the filing at all. *People v. Redd*, 173 Ill. 2d 1, 35 (1996). Since a party is allowed to rest on his written motion, particularly when the trial judge stressed that he had read it, we find that defendant preserved this issue for our review. However, as we explain in section 5 of this opinion, the forfeiture issue does not affect our decision, since we also find that the error rises to the level of plain error.

¶ 70 In support of its forfeiture argument, the State cites *People v. Schmitt*, 131 Ill. 2d 128 (1989). In *Schmitt*, our supreme court held that defendant had failed to preserve his severance motion for appeal, where no ruling was made prior to trial, where defendant brought the omission to the trial court's attention during trial, and where defendant then agreed to the conduct of simultaneous but separate bench trials. Our case is nothing like *Schmitt*, where the defendant's explicit agreement removed the need for a ruling.

¶ 71 In the case at bar, the State also claims that defendant forfeited the issue of a database search by failing to raise it in a posttrial motion. Defendant's posttrial motion referred

specifically to his pretrial DNA motion. However, his posttrial motion did not reiterate his alternative argument, stated in his pretrial motion, that if the trial court denied his motion to exclude the DNA evidence, due to destruction of evidence, then the trial court should order a database search. Defendant's specific identification of the pretrial motion at issue was sufficient to preserve the issue for appellate review. *People v. Lewis*, 223 Ill. 2d 393, 401 (2006) (the claimed violation of a hearsay statute was preserved for review, even though defendant's posttrial motion claimed only that "[defendant] was not proven guilty beyond a reasonable doubt because the State presented hearsay testimony," and even though it did not identify the witness, the testimony or the statute, because there were only two hearsay objections at trial).

¶ 72    The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). When a defendant has failed to preserve an error for review, we may still review for plain error. *Piatkowski*, 225 Ill. 2d at 562-63; Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.").

¶ 73    "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471.

¶ 74    We find, for the reasons stated above, that the error was preserved for appellate review and that the plain error doctrine does not apply. For the reasons discussed below in section 5 of this opinion, we also find that, even if defendant forfeited the error by failing to raise it specifically in his posttrial motion, the error qualified as "plain error" under the second prong of the plain error doctrine.

¶ 75                              3. Statutory Interpretation

¶ 76    As noted, this is a case of first impression. Neither we nor the parties were able to locate an appellate case reviewing a trial court's denial of a defendant's pretrial motion for a DNA database search, pursuant to section 116-5. 725 ILCS 5/116-5 (West 2006).

¶ 77    As far as we know, the statute has been cited three times in published Illinois opinions: (1) *In re Lakisha M.*, 227 Ill. 2d 259 (2008); (2) *In re Jesscia M.*, 399 Ill. App. 3d 730 (2010); and (3) *People v. Watson*, 2012 IL App (2d) 091328. First, in *In re Lakisha M.*, 227 Ill. 2d 259, 272 (2008), the Illinois Supreme Court cited the statute in passing, observing that it authorizes the release of database information to defense counsel. Second, in *In re Jesscia M.*, 399 Ill. App. 3d 730 (2010), the appellate court also discussed the statute in *dicta*. The *Jessica M.* court observed that the statute authorized the defense to make a motion for "genetic marker analysis," which the court defined as "computerized patterns of the genetic

-14-

marker groupings within the database, rather than the initial biological testing of the samples themselves." *In re Jessica M*., 399 Ill. App. 3d at 747. In the case at bar, the question of whether the statute authorizes biological testing is not an issue, since defendant is requesting only a computerized search and not biological testing. Thus, this *dicta* does not apply to our case. Third, in *Watson*, the majority held that a defense attorney was ineffective for failing to probe the statistical meaning of a seven-loci "match." *Watson*, 2012 IL App (2d) 091328, ¶ 25. The majority pointed out the options that a defense counsel has, observing that "there is a statutory procedure by which an attorney may request a database search." *Watson*, 2012 IL App (2d) 091328, ¶ 31. The desirability of the search option appears to be one of the few points that both the majority and the dissent in *Watson* agreed on. The dissent stated "I am surprised" that the appellate defense counsel had "not considered whether trial counsel should have sought a court order directing the State Police to search the Illinois database." *Watson*, 2012 IL App (2d) 091328, ¶ 89 ( Birkett, J., dissenting). None of these cases involved, as our case does, a trial court's denial of a defense request for a pretrial database search.

¶ 78 Even though we are without case law, we are not without guidance. As we do in every case of statutory interpretation, we look first and foremost to the language of the statute itself. *Cardamone*, 232 Ill. 2d at 512. Our primary objective in construing a statute is to give effect to the legislature's intent. *Cardamone*, 232 Ill. 2d at 512. We consider the statute in its entirety, "keeping in mind the subject it addresses and the legislature's apparent objective in enacting it." *Cardamone*, 232 Ill. 2d at 512.

¶ 79 The legislature's objective in enacting section 116-5 was to level the playing field. 725 ILCS 5/116-5 (West 2006); see also Erin Murphy, *The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence*, 95 Calif. L. Rev. 721, 790-91 (2007) (the purpose of the Illinois statute is to provide the defendant, "upon a particular showing," with "a parallel capacity to investigate an offense through a search of the database"). That purpose is clear from the language of the statute itself, which provides access to the DNA database to the defendant. The State already has unlimited and unfettered access.

¶ 80 The statute requires a defendant to show only that "DNA evidence may be material to the defense investigation or relevant at trial." 725 ILCS 5/116-5 (West 2006). On appeal, the State does not argue that DNA evidence was not "material to the defense investigation." The materiality of the search request to the defense investigation is shown by the late addition of a consent defense, after the request was denied.

¶ 81 The primary evidence identifying defendant as the offender was a nine-loci analysis between his DNA profile and a male DNA profile obtained from the victim's rectal swabs. As the State's expert conceded at trial, his 13-loci analysis on the victim's underwear failed to yield a "match." *People v. Schulz*, 154 Ill. App. 3d 358 (1987) (where the expert's testimony "demonstrated nothing more than that defendant could not be excluded as the semen donor," "this testimony served no relevant purpose, was totally lacking in probative value, and thereby prejudiced defendant's cause"). A trial court cannot bar a defendant's access to evidence that has a good chance of creating a reasonable doubt in the jury's mind, in light of the facts and circumstances of the case and the other evidence that is likely to be

-15-

admitted at trial. To do so would be to pervert the purpose of the statute and call into question the integrity of the criminal process.

¶ 82      That the requested search would have a good chance of leading to "reasonable doubt" evidence was shown by the Arizona study. Now, we also know that an actual study of the Illinois database did yield over 900 pairs at only 9 loci. However, as Donald Parker, the administrator of the Illinois database tesified, if you looked at further loci, these 903 pairs would not be matches. We also know that a similar study of the Maryland offender database yielded similar results. In Maryland, a court in a death penalty case ordered a study of Maryland's offender database, at the defendant's request. Ken Strutin, *Databases, E-Discovery and Criminal Law*, 15 Rich. J.L. & Tech. 6, 54 (2009). Although the Maryland database contained fewer than 30,000 profiles–a small fraction of the size of the Illinois database–the Maryland search also yielded 32 pairs at 9 loci, which does not mean a match because the other loci were not included. Strutin, *supra*, at 54.

¶ 83      The dangers of partial matches have been known for over a decade. For example, in a highly publicized English case, Raymond Easton was charged in 1999 with burglary after police had a " 'cold hit' " with his DNA in a database. Jennifer L. Mnookin, *Fingerprint Evidence in an Age of DNA Profiling*, 67 Brook. L. Rev. 13, 49-50 (2001); Allison Pari, *Note, An International DNA Database: Balancing Hope, Privacy, and Scientific Error*, 24 B.C. Int'l & Comp. L. Rev. 341, 368-69 (2001). His DNA "matched" the DNA from the crime scene at six loci. Since British police estimated that there was only a 1 in 37 million chance that such a match would occur at random, he was charged with burglary. Mnookin, *supra*, at 50; Pari, *supra*, at 368-69. When Easton, who had advanced Parkinson's disease, had an alibi, the police ran a test at more loci and discovered that his DNA did not match at all. Mnookin, *supra*, at 50; Pari, *supra*, at 368-69. The charges were, of course, dropped. Mnookin, *supra*, at 50; Pari, *supra*, at 368-69.

¶ 84      As a result of the Arizona, Maryland and Illinois searches, some legal scholars and scientists have questioned whether the extraordinarily large figures used in court to estimate the probability of a nine-loci "match" are "no better than alchemy." David H. Kaye, *Trawling DNA Databases for Partial Matches: What Is the FBI Afraid Of?*, 19 Cornell J.L. & Pub. Pol'y 145, 146 (2009); Strutin, *supra*, at 54 (after the Arizona, Maryland and Illinois searches, "academics and experts have added their voices in calling for access to the DNA databanks to test the assumptions of profile rarity"). For example, a Stanford mathematician has called these numbers " 'total nonsense' " and " 'a damned lie.' " Kaye, *supra*, at 148 (quoting Keith Devlin, *Damned Lies*, Mathematical Association of America (2006), *available at* http://www.maa.org/devlin/devlin_10_06.html.). He has stated that admitting this testimony into court is " 'disgraceful,' " and that courts " 'may as well admit alchemy and astrology.' " Kaye, *supra*, at 147 (quoting Keith Devlin, *Damned Lies*, Mathematical Association of America (2006), *available at* http://www.maa.org/devlin/devlin_10_06.html.).

¶ 85      Although the trial court in the case at bar was not presented with the results of the Maryland or Illinois searches, the trial court did have in front of it a report from the search of the Arizona database, which revealed 120 pairs of 9-loci "matches" in a database of 65,493 offenders. Kaye, *supra*, at 154-55 (describing how the Arizona study was conducted

and its results). As one legal scholar has asked, if the frequency "for a nine-locus match is anything like 'one in 754 million for whites, and one in 561 million for blacks' [as some DNA experts testify], how can it be that a database as small as [Arizona's with] 'a mere 65,493 entries' produces even one such match?" Kaye, *supra*, at 155; Erin Murphy, *The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence*, 95 Calif. L. Rev. 721, 781 (2007) ("recent evidence calls into question the accuracy of using the product rule to convey match probabilities").

¶ 86     We have not been asked to determine whether the expert's conclusion of a "match" based on only nine-loci was correct. We have been asked to determine whether the trial court abused its discretion in denying the defense the ability to investigate and impeach this conclusion. Considering that a nine-loci analysis was the primary identification evidence against defendant, the trial court abused its discretion by denying defendant's motion. *C.f. People v. Watson*, 2012 IL App (2d) 91328, ¶ 25 (defense counsel was ineffective for failing to probe the statistical meaning of a seven-loci "match" when plenty of arguments and evidence were available).

¶ 87     The dissent relies heavily on the case of *State v. Dwyer*, 2009 ME 127, 985 A.2d 469, in which the Maine Supreme Court held that it was not an abuse of discretion for a Maine trial court to deny a defense request for a database search for nine-loci matches. However, what the dissent overlooks is that, in Illinois, we have a statute that specifically authorizes DNA database searches and that our statute is very different from Maine that has none. 725 ILCS 5/116-5 (West 2006). The Illinois statute requires the defense to show *either* that the search may be relevant at trial "or" that it may be material to the defense investigation. 725 ILCS 5/116-5 (West 2006). The "or" in this sentence means that the defense must show one or the other, but not both. Thus, in Illinois, to obtain a database search, a defendant is *not* required to show that the search will produce results that are relevant to or admissible at trial. By contrast, in Maine, the standard is different. In Maine, a defendant *must* show that the anticipated evidence will be admissible at trial. *Dwyer*, 2009 ME 127, ¶ 16, 985 A.2d 469. That is simply not the standard in Illinois. The difference between the law of the two states becomes more clear, when one remembers that an Illinois court already ordered a nine-loci search, pursuant to our statute. See *id.* ¶ 50 (describing the search run in the case of People v. Juan Luna, No. 02 CR 15430 (Cir. Ct. Cook Co.) (hereafter *Luna*), to determine the number of entries in the Illinois offender database that will appear identical at only nine-loci).

¶ 88                                    4. Consent Defense

¶ 89     Although neither party raised this issue in its appellate briefs, the State claimed at oral argument that defendant's use of a consent defense at trial barred this claim on appeal. The State is confusing two statutes: the statute that permits postconviction DNA testing (725 ILCS 5/116-3 (West 2006)); and the statute that permits pretrial DNA testing (725 ILCS 5/116-5 (West 2006)).

¶ 90     A defendant's use of a consent defense at trial does bar him from seeking postconviction DNA analysis. 725 ILCS 5/116-3(c) (West 2006). However, our legislature specifically did

not include this bar in its pretrial statute. By contrast, to seek a pretrial search, a defendant must show only that it "may be material to the defense investigation." 725 ILCS 5/116-5(a) (West 2006). Thus, the key issue under the pretrial statute is not whether the defendant intends to use a consent defense, but whether his request showed that the DNA search may have been material to the defense investigation. To rule otherwise would be to rewrite the statute.

¶ 91   First, we find that the State forfeited the consent issue by failing to raise it in its appellate briefs. Second, we find that, even if it was not forfeited, defendant's use of a consent defense at trial did *not* act as a judicial admission of identity on appeal under the particular facts and circumstances of this case.

¶ 92   "[J]udicial admissions 'are formal concessions in the pleadings in the case or stipulations by a party or its counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.' " *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 557-58 (2005) (quoting 2 John William Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992)). In other words, if a fact is judicially admitted, the adverse party has no need to submit any evidence on that point. The admission serves as a substitute for proof at trial. *Lowe v. Kang*, 167 Ill. App. 3d 772, 776 (1988) (judicial admissions "dispens[e] with proof of a fact claimed to be true, and are used as a substitute for legal evidence at trial"), cited with approval in *People v. Howery*, 178 Ill. 2d 1, 40-41 (1997). We do not find a judicial admission occurred here, for the following reasons.

¶ 93   First, the Illinois Appellate Court has previously held that a defense counsel's opening and closing statements in a criminal case do not always qualify as judicial admissions and thus they do not always preclude a defendant from arguing on appeal that the State failed to prove an element of the offense beyond a reasonable doubt. *People v. Neylon*, 327 Ill. App. 3d 300, 307 (2002). For example, in *Neylon*, the defendant stood accused of personally discharging a firearm, and his counsel argued in his opening statement that the defendant had fired a gun inside a residence, because the defendant had not realized that such a firing was against the law. *Neylon*, 327 Ill. App. 3d at 306. The defense counsel then followed that concession with a second concession, this time during closing statement, that defendant owned the gun in question. *Neylon*, 327 Ill. App. 3d at 307. After the appellate court observed that, for a conviction of this particular offense, the defendant "must possess and discharge his firearm," the appellate court reversed his conviction, holding that there was "no proof defendant personally fired the gun." *Neylon*, 327 Ill. App. 3d at 307. Thus, the appellate court concluded that this defense counsel's concessions in his opening and closing statements constituted "no proof." *Neylon*, 327 Ill. App. 3d at 307.

¶ 94   The facts of *Neylon* are remarkably similar to the facts in the case at bar. In both cases, defense counsel conceded that his client had committed the act at issue. In our case, the act was sexual penetration; in the *Neylon* case, it was discharging a gun inside a residence. *Neylon*, 327 Ill. App. 3d at 306. In both cases, defense counsel argued that their clients lacked the requisite *mens rea* or state of mind for the crime. In our case, defense counsel argued that the acts were consensual; and in the *Neylon* case, defense counsel argued that the acts were done under the mistaken impression that they were legal. *Neylon*, 327 Ill. App. 3d at 306. In *Neylon*, the appellate court found that counsel's concessions did not qualify as

-18-

judicial admissions. *Neylon*, 327 Ill. App. 3d at 307. Applying the holding of *Neylon* to the facts of our case requires us to reach the same holding here.

¶ 95 Second, on the facts and circumstances of this case, a finding by us that defendant made a judicial admission would be to turn a blind eye to the reality facing this particular defendant. In *Howery*, a criminal defendant asked our supreme court to find that remarks by a prosecutor in the State's rebuttal closing constituted a "judicial admission." However, our supreme court held that the closing remarks did "not constitute a judicial admission." *Howery*, 178 Ill. 2d at 42. In a parenthetical, our supreme court cited the civil case of *Lowe* for the proposition that "whether or not a statement by an attorney is a judicial admission depends upon the circumstances of the individual case." *Howery*, 178 Ill. 2d at 41 (discussing in a parenthetical *Lowe*, 167 Ill. App. 3d at 777). Thus, we will review the "circumstances" of the case at bar.

¶ 96 In the case at bar, defendant was facing a type of evidence that juries and courts alike find highly persuasive: a DNA match. Today, whenever a DNA expert uses the words, "it's a DNA match," the jury believes that the defendant is guilty. *In re T.W.*, 402 Ill. App. 3d 981, 992-93 (2010) (finding that DNA evidence alone constituted "overwhelming" evidence, even where defendant looked nothing like the victim's description of the assailant); *People v. Johnson*, 389 Ill. App. 3d 618, 619 (2009) (finding that an expert's testimony about a DNA match was "overwhelming" evidence). See also *People v. Safford*, 392 Ill. App. 3d 212 (2009) ("witnesses have little chance of being found credible when [forensic] evidence points to the defendant being present at the scene of the crime"). The American Psychological Association published an article in 2008 that summarized conclusions from three different studies concerning the impact of DNA evidence on a jury. Joel D. Lieberman *et al.*, *Gold Versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Forensic Evidence?*, 14 Psychol. Pub. Pol'y & L. 27 (2008). The article concluded that DNA evidence has a " 'mystical aura.' " Lieberman *et al.*, *supra,* at 33. "Public jurors, on average, rated DNA evidence as 95% accurate, and it was rated as 94% persuasive of a suspect's guilt." Lieberman *et al.*, *supra*, at 52-53. The article warned that "[t]he strong and largely invariant impact of DNA evidence across experimental conditions suggests that this type of scientific evidence may be so persuasive that its mere introduction in a criminal case is sufficient to seriously impede defense challenges." Lieberman *et al.*, *supra*, at 58.

¶ 97 Although the claimed "match" in this case was based on only a 9-loci analysis instead of the standard 13-loci analysis, the State's expert still claimed that it was a "match." Showing the frequency with which such nine-loci "matches" appeared in the offender database would have provided a strong basis for cross-examination; yet, defendant was denied the ability to develop this evidence. After he was denied the ability to develop this evidence, it would be absurd to criticize him for resorting to a consent defense. *Johnson*, 389 Ill. App. 3d at 619 ("[f]aced with overwhelming DNA evidence, the defense in this sexual assault *** case attempted to persuade the jury" that he did not force the victim). It would be like knocking out one leg and criticizing him for hopping on one foot.

¶ 98 Even if we found that consent acted as a bar, we would then have to find ineffective assistance of counsel, as we discuss in the last section of this opinion.

¶ 99                                    5. Plain Error Analysis

¶ 100    Even though we found in section 2 of this opinion that defendant did not forfeit this issue
for appellate review, the forfeiture issue is not material to our decision, since the plain error
doctrine is satisfied.

¶ 101    The trial court's denial of defendant's motion for a database search violated the second
prong of the plain error doctrine. Under the second prong of the plain error doctrine, an error
rises to the level of "plain error" when the "error is so serious that it affected the fairness of
the defendant's trial and challenged the integrity of the judicial process, regardless of the
closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565; *Woods*, 214 Ill. 2d at 471. In the
case at bar, the error challenged the integrity of the judicial process by barring defendant's
access to evidence that could have assisted him in establishing his innocence, by casting a
serious doubt on the State's identification evidence. The State's own administrator in charge
of its DNA offender database testified in another case that a nine-loci analysis is simply not
a "match." By contrast, in the case at bar, the State's expert testified that there was a "match"
based on a nine-loci analysis, and this "match" was the primary evidence identifying
defendant as the perpetrator. From the 13-loci analysis, defendant could be neither excluded
nor identified as the perpetrator. By barring the defense from even the chance to develop
evidence that could have undermined the claimed "match," the trial court's error seriously
affected the fairness of defendant's trial. *Cf. Watson*, 2012 IL App (2d) 091328, ¶ 25 (defense
counsel's performance fell below an objective standard of reasonableness when she failed
to probe the statistical meaning of a seven-loci "match"). See also 725 ILCS 5/116-5(a)
(West 2006) (all a defendant has to show is that the "DNA evidence may be material to the
defense investigation").


¶ 102                              6. Ineffective Assistance of Counsel

¶ 103    As noted above, even if we found that consent acted as a bar, we would then have to find
ineffective assistance of counsel. Defendant specifically alleged in his *pro se* posttrial motion
that his trial counsel was ineffective in his handling of the pretrial DNA motion and for
failing to hire an independent DNA expert. On appeal, defendant claims in his brief to this
court that the trial court "failed to adequately inquire into [defendant's] *pro se* claims of
ineffective assistance of counsel." The trial court concluded that the "allegations of
ineffective assistance of counsel" in defendant's *pro se* motion "go to trial strategy *** on
it's face [*sic*]," and thus the trial court conducted no inquiry into those claims.

¶ 104    A criminal defendant has a constitutional right to the effective assistance of counsel at
trial. *People v. Smith*, 195 Ill. 2d 179, 187 (2000) (citing *Strickland v. Washington*, 466 U.S.
668, 686-87 (1984)). This right also applies to pretrial proceedings to exclude evidence.
*Smith*, 195 Ill. 2d at 188-89. To establish a claim of ineffective assistance of counsel, a
defendant must prove both (1) deficient performance and (2) prejudice. *Smith*, 195 Ill. 2d at
187-88 (citing *Strickland*, 466 U.S. at 687).

¶ 105    To satisfy the first prong of the *Strickland* test, a defendant must show that his counsel's
performance fell below an objective standard of reasonableness, as measured by prevailing
norms. *Smith*, 195 Ill. 2d at 188. In considering whether counsel's performance was deficient,

a court must indulge a strong presumption that the challenged action, or inaction, was the result of sound trial strategy. *Smith*, 195 Ill. 2d at 188.

¶ 106    To satisfy the second prong, a defendant must establish a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Smith*, 195 Ill. 2d at 188 (citing *Strickland*, 466 U.S. at 694). A probability rises to the level of a "reasonable probability" when it is sufficient to undermine confidence in the outcome or the proceeding. *Smith*, 195 Ill. 2d at 188. Counsel's deficient performance must have rendered either the outcome unreliable or the proceeding fundamentally unfair. *Smith*, 195 Ill. 2d at 188.

¶ 107    When a defendant raises a claim of ineffective assistance of counsel on direct appeal, the trial court may consider the claim or it may decline to adjudicate it if it involves "matters beyond the record on direct appeal." *People v. Parker*, 344 Ill. App. 3d 728, 737 (2003) (quoting *People v. Burns*, 304 Ill. App. 3d 1, 11 (1999)); *People v. Ligon*, 365 Ill. App. 3d 109, 121-23 (2006) (appellate court chose to consider one of defendant's three ineffectiveness claims but declined to adjudicate the other two). Declined matters may be addressed later in a proceeding for postconviction relief. *Ligon*, 365 Ill. App. 3d at 122. In the case at bar, the appellate record is sufficient for us to review defendant's claim.

¶ 108    The record before us establishes that defense counsel was asking the trial court to order a database search, that had already been done, and that had been done at the request of the same counsel.

¶ 109    On October 17, 2006, Donald Parker, the administrator in charge of our state's offender database, testified at his deposition in the *Luna* case that, in his opinion, "[i]f it doesn't match across the thirteen loci, then it's not a true match." Parker stated repeatedly that nine-loci comparisons are "not true matches" and that "[i]t's misleading to call them matches."

¶ 110    At this same deposition, Parker testified that, in response to an order by the trial court in the *Luna* case, he had already run a search of the Illinois database to determine how many pairs of matches it contained at only nine loci. The database search revealed 903 pairs at 9 loci. In other words, 1,806 individuals had the same alleles at 9 loci, as at least one other individual in the database. Parker testified that "[i]f you look[ed] at the further loci, they would be considered nonmatches."

¶ 111    Present at this deposition on October 17, 2006, was Andrew Northrup, an assistant public defender who appeared on behalf of one of the defendants in the *Luna* case. Several months later, on February 8, 2007, the trial court in the case at bar heard argument from counsel on defendant Wright's DNA motion. The assistant public defender representing defendant Wright on February 8, 2007, was the same assistant public defender who had appeared at Parker's deposition on October 17, 2006: Andrew Northrup. Northrup failed to inform the trial court on February 8, 2007, that the database search had already been performed and what the results were, or that the state's own director of that database had stated that it was "misleading" to call a nine-loci comparison "a match." Northrup's co-counsel, Ketih Ahmad, did inform the trial court at the conclusion of the February 8 proceeding that Northrup was leaving the defender's office.

¶ 112    On February 8, 2007, instead of informing the trial court of the results of the recent nine-

loci search of the Illinois database, Northrup stated only that "we have seem [*sic*] to learn that 9 loci matches are not completely uncommon." Northrup argued that use of the nine-loci analysis "would deprive Mr. Wright of a fair trial, particularly because this is the only evidence against him, this 9 loci match."

¶ 113　We cannot think of a single reason, strategic or otherwise, why defense counsel would withhold from the trial court the information that a 9-loci search of the Illinois database had already been done, that it had revealed that close to 2,000 individuals had matched at 9 loci, and that the State's own director of that database had concluded that 9-loci "matches" were not, in fact, matches. This information was highly favorable to the defense's motion to exclude the nine-loci analysis, and as defense counsel observed, this was "the only evidence against him." Without it, the State had almost no case. *Cf. In re T.W.*, 402 Ill. App. 3d at 992-93 (holding that, where no "potential discrepancies or errors in the DNA test results" were exposed, DNA evidence alone constituted "overwhelming" evidence). Thus, we find that the first prong of *Strickland* is satisfied.

¶ 114　As for the second prong, we find that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. If the trial court had in front of it the information that a 9-loci search of the Illinois database had already been done, that it had revealed that close to 2,000 individuals had matched at 9 loci, and that the state's own director of that database had concluded that 9-loci "matches" were not, in fact, matches, there is a reasonable probability that it would have granted the defense's motion to exclude the 9-loci analysis, which was the primary evidence against defendant.

¶ 115　Thus, even if we were to find that consent was a bar, we would have to find ineffective assistance of counsel. *Watson*, 2012 IL App (2d) 091328, ¶ 25 (defense counsel was ineffective for failing to probe the statistical meaning of a seven-loci "match").

¶ 116　　　　　　　　　　　　　7. Cross-Examination

¶ 117　Defendant also claims on appeal that the trial court abused its discretion by barring defense counsel from asking the State's DNA expert any questions about the Arizona study.

¶ 118　The facts underlying this claim are few and straightforward. During cross-examination and in response to a question asked by the trial court (quoted above in the Background section), Edgar Jove, the State's DNA expert, indicated that, in his experience, he had never seen a nine-profile match that was not accurate. Defense counsel then tried to immediately follow up with questions about the Arizona study, which had been provided to Jove before trial and which contained over a 100 pairs of 9-loci matches. The trial court barred any questions about it, indicating that the State had already obtained a favorable ruling on a motion *in limine* on this specific issue.

¶ 119　On appeal, the State claims that defendant forfeited review of this issue. As we discussed above, to preserve an issue for an appellate review, a defendant must raise the issue, first, at trial and, second, in a posttrial motion. *Woods*, 214 Ill. 2d at 470; *Piatkowski*, 225 Ill. 2d at 564.

¶ 120　First, defense counsel's unsuccessful attempt to raise this issue at trial is quoted above,

in the Background section of this opinion. On appeal, the State argues that defendant forfeited any claims with respect to the Arizona study by allegedly failing to obtain a ruling on this portion of his pretrial motion. However, at trial, the court stated that there was, in fact, a ruling on "this issue" of the Arizona study. Thus, we do not find this argument persuasive. Second, defendant's posttrial motion referred specifically to his pretrial DNA motion in which he discussed the Arizona study in detail and asked the trial court to provide a limiting instruction on the evidence's defects, if the State's DNA evidence was admitted. Defendant's "supplemental" version of his pretrial motion included a copy of the Arizona study and stated that defendant had already provided a copy to the State's DNA expert. As we already stated above, we find that defendant's specific reference to his pretrial DNA motion was sufficient to preserve the DNA issue for our review.

¶ 121     The dissent finds that defendant forfeited this issue by failing to make an offer of proof during trial and cites in support *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992). *Andrews* stated that the purpose of an offer of proof is to disclose to the trial court, the opposing counsel and, eventually, the reviewing court "the nature of the offered evidence." *Andrews*, 146 Ill. 2d at 421. In the case at bar, the trial court's and the prosecutor's familiarity with "the nature" of the issue was evident from the fact that just the words "Arizona database" were enough to trigger the prosecutor's swift objection followed by the trial court's immediate recollection of the pretrial discussion and ruling. The "nature of the offered evidence" was disclosed to them in the defendant's pretrial motions, in both his original and supplemental DNA motion. Specifically, in the State's response to defendant's original pretrial motion, the State had objected on the ground that it had not been provided with a copy of the Arizona study. In reply, defendant filed a "supplemental" motion in which he observed that he had already provided the study to the State's DNA expert. However, defendant also attached a copy of the five-page report from the Arizona study to his supplemental motion, which is also in our appellate record. Thus, we find that defendant adequately disclosed to the trial court, to opposing counsel and to us the nature of the evidence offered.

¶ 122     The dissent also finds that defendant failed to explain the relevance of the Arizona study to his case. However, in his pretrial motion, he stated: "The statistics that they cite in this case are 1 in 420 trillion blacks, 1 in 670 trillion whites, and 1 in 2.9 quadrillion Hispanics." He further stated: "However[,] a recent examination of Arizona's convicted offender database revealed 120 nine location matches between two inmates in a database of 65,493 offenders. In other words, in Arizona there is a 1 in 700 chance that two individuals will match up at nine locations." His supplemental motion further explained that "[t]his information is relevant in determining how much weight to attach to the statistics set forth in this case by the government." We find that this was a more than adequate explanation of the relevance of the study to his case. For these reasons, we do not find the issue forfeited.

¶ 123     The decision of whether to allow expert testimony on a particular topic is a decision usually left to the sound discretion of the trial court, and a reviewing court will not usually reverse the trial court absent an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs when the trial court's decision is arbitrary or unreasonable. *Becker*, 239 Ill. 2d at 234.

¶ 124     Rule 705 of the Illinois Rules of Evidence (Ill. R. Evid. 705 (eff. Jan. 1, 2011)) permits

an expert to give an opinion without divulging the basis for it. Although Rule 705 was not enacted at the time of defendant's trial, it merely codifies preexisting case law. Ill. R. Evid., Committee Commentary (eff. Jan. 1, 2011) (the newly enacted Illinois Rules of Evidence merely codified existing case law whenever the Illinois Supreme Court "had clearly spoken"); *People v. Williams*, 238 Ill. 2d 125, 137 (2010) (observing that, in 1981, the Illinois Supreme Court had adopted the identical Rule 705 of the Federal Rules of Evidence). Rule 705 shifts the burden to the opposing party to elicit and to explore the underlying facts or data on cross-examination. *Williams*, 238 Ill. 2d at 140. An unnecessary curtailment of cross-examination undercuts the burden-shifting scheme embodied in Rule 705.

¶ 125　The appellate court has held that even a "routine" defense against a less-than-13-loci comparison should include argument that such a "match" is not uncommon. *Watson*, 2012 IL App (2d) 091328, ¶ 31. In *Watson*, we recently held that a defense counsel's performance fell below an objective standard of reasonableness when she failed to probe the statistical meaning of a a seven-loci "match" admitted against her client. *Watson*, 2012 IL App (2d) 091328, ¶ 25. It would be strange to require defense counsel–at danger of being held ineffective–to make this argument and then deny her the means to support it. "[Q]uestioning the statistical implications of a recovered DNA profile is a basic line of inquiry." *Watson*, 2012 IL App (2d) 091328, ¶ 31.

¶ 126　Even if the Arizona study itself was not admissible at trial, the expert could have been cross-examined about it. Rule 703 provides that, even if facts or data are not admissible in evidence, the expert may be asked to offer an opinion based on them, if they are disclosed at or before trial and if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." In the case at bar, the study was disclosed to the expert at trial, and the defense was denied the opportunity of asking whether this was the type of data usually relied upon by experts in his field.

¶ 127　In the case at bar, the trial court qualified the State's expert as an expert "in the field of forensic DNA analysis" but then blocked the defense from asking any questions about possibly conflicting results from a forensic DNA study that the defense had provided to this same expert prior to trial. "An expert's opinion is only as valid as the basis and reason for the opinion." *Wilson v. Bell Fuels, Inc.*, 214 Ill. App. 3d 868, 875 (1991). We find that the trial court abused its discretion when it barred the defense from posing a single question to the expert about the Arizona study.

¶ 128　Since defendant preserved this issue for our review, the State bears the burden of showing that any error was harmless beyond a reasonable doubt. *People v. Johnson*, 238 Ill. 2d 478, 488 (2010) (defendants "properly preserved their claims of error, thus requiring the State to show that the errors were nonprejudicial under a harmless-error analysis"). For an error to be considered harmless, the State must establish, beyond a reasonable doubt, that the error did not contribute to the verdict. *People v. Stechly*, 225 Ill. 2d 246, 304 (2007). A reviewing court may find an error harmless, if the remaining evidence is overwhelming or if the evidence at issue merely duplicates other properly admitted evidence. *Becker*, 239 Ill. 2d at 240. In the case at bar, the evidence was far from overwhelming, and defendant's questions about the Arizona study were not duplicative of any other evidence in the record. We cannot find, beyond a reasonable doubt, that the outcome was not affected by the trial

court's preclusion of defendant's attempted impeachment of the State's DNA evidence.

¶ 129     Recently, we found that a trial court's denial of a defense request for independent DNA testing was harmless, because defense counsel was permitted extensive cross-examination of the State's expert and nothing at trial suggested "potential discrepancies or errors in the DNA test results." *In re T.W.*, 402 Ill. App. 3d at 993. Conversely, in the case at bar, defendant's opportunity to cross-examine was limited, and it was specifically limited with respect to exposing potential discrepancies or errors in the DNA test results.

¶ 130     For these reasons, we find that the trial court abused its discretion by curtailing cross-examination.

¶ 131                                    CONCLUSION

¶ 132     For the foregoing reasons, we reverse and remand for a new trial. We find that the trial court abused its discretion by denying defendant's motion to order the Illinois State Police to conduct a nine-loci database search. We find that defendant did not forfeit this issue for review and that, even if he had forfeited it, this error rose to the level of plain error. We also find that defendant received ineffective assistance of counsel and that the trial court abused its discretion by barring the defense from asking the State's DNA expert any questions about the Arizona study. We take no position whether, on remand, the trial court must order a new search, upon defendant's motion, or whether the trial court may direct the parties to rely on a similar search already conducted by the Illinois State Police in another case.

¶ 133     Reversed and remanded with directions.

¶ 134     JUSTICE McBRIDE, dissenting:

¶ 135     I respectfully dissent from the majority's decision to reverse and remand for a new trial because I believe the claimed errors have been forfeited. Under the plain error rule, defendant must show that a clear or obvious error occurred and the evidence is so closely balanced that the error alone severely threatened to tip the scales of justice against him or that a clear and obvious error occurred and the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Since the defendant has not met his burden of persuasion under either prong of the rule, his claims are forfeited.

¶ 136     The first claimed error was the trial court's denial of defendant's motion to order the State to perform a comparative search of its convicted felon DNA database known as CODIS (Combined DNA Index System) to see if any of the database's records matched each other at nine or more loci. This comparative search has been referred to as an "Arizona search" because when it was first run by a DNA analyst in that state, it produced a nine-loci match between two unrelated individuals in the Arizona CODIS. A subsequent search in Arizona yielded more matches. *State v. Dwyer*, 2009 ME 127, ¶ 12, 985 A.2d 469.

¶ 137     I do not agree that the trial court erred in the denial of this request because defendant has not shown how a database search would have produced relevant evidence to compare with

the DNA testimony presented at defendant's trial. Although the motion claimed that a study would give perspective to the strength of the partial profile match developed in this case, there was no scientific support for such a claim. Citing to the Arizona study does not make defendant's argument persuasive. The Arizona study contains twins, relatives and duplicate samples. Moreover, the study itself indicates that it was not generated or used by the Arizona Department of Public Safety Crime Laboratory for *any statistical analyses*. It also indicates that the 11 and 12 locus matches are confirmed siblings. Finally, it indicates that "relatedness" between 9 and 10 locus matches has not been determined. Defendant does not address this fact, nor explain how any scientific comparison could be made here. In this case, there was no proffered testimony, no evidentiary basis, no scientific argument to demonstrate how a database search would produce relevant evidence to compare that search with the DNA testimony presented at defendant's trial. Defendant simply rested on the pleadings. Evidentiary rulings are generally reviewed for an abuse of discretion. The denial of this motion does not show that the trial court committed an error so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process.

¶ 138    Even on appeal, defendant has not supplied this court with any support for his claim or how the database search would have produced relevant evidence that could have been used at defendant's trial. Defendant has not referred to any reported decision suggesting that data based studies have been used to call into question the validity of random match probability calculations. The majority has cited an article not presented to the trial court and taken isolated testimony of a deposition transcript from another criminal matter and used those materials to conclude the trial court erred. I respectfully disagree with that type of analysis and find no authority for doing so.

¶ 139    The majority suggests the primary evidence identifying defendant as the offender was a 9-loci analysis between his DNA profile and a male DNA profile obtained from the victim's rectal swabs. This statement, however, ignores the other DNA evidence presented at trial.

¶ 140    The majority also suggests there was no match in this case. I disagree with this characterization. When a law enforcement agency attempts to connect a DNA sample to a particular person, it does not compare entire DNA sequences, but rather the DNA at thirteen specific places or loci. A person's DNA characteristics at those thirteen loci make up his or her DNA profile. A match between an unknown sample and the profile of a particular person can occur at all thirteen or fewer loci. As more loci match, the probability increases that the DNA in the unknown sample comes from that person.

¶ 141    The testimony from the prosecution's DNA expert, Mr. Jove, was compelling. This testimony established that the 9-loci profile obtained from the victim's rectal swabs matched that of the defendant and Jove was able to calculate a frequency of the male DNA profile even though it was not a complete profile. This male profile identified in the rectal swabs would be expected to occur in approximately one in 420 trillion black, one in 670 trillion white, or one in 2.9 quadrillion Hispanic unrelated individuals. Jove also testified the defendant could not be excluded as a contributor to the male human DNA profile taken from the victim's underwear. From this evidence, he estimated that one in 5.4 quadrillion black, one in 4.3 quadrillion white or one in 66 quadrillion Hispanic unrelated individuals could not be excluded as male contributors. In fact, Jove had never heard of a case where the first nine

loci matched and that same person was later excluded as a possible offender.

¶ 142    The majority also concludes that the trial court's erroneous ruling prompted the consent defense. I completely disagree. I think it is clear that the DNA evidence disclosed to the defense prior to trial prompted the consent defense rather than the trial court's ruling. Even though the defendant did not testify, the jury was advised of the consent defense in opening statements, during trial through cross-examination, during closing arguments, and then in the final instructions on the law tendered by the judge. As a result, defendant has waived any challenge to the database search when he argued to the jury that the victim consented to the sexual acts.

¶ 143    It appears the denial of a motion for an "Arizona" database search has not been the subject of a reviewing court's decision in Illinois; however, the Maine Supreme Court considered the denial of such a motion in the *Dwyer* decision. *Dwyer*, 2009 ME 127, ¶ 12, 985 A.2d 469. In that case, in response to defendant's motion, the State called one witness, Catherine MacMillan a DNA analyst for the Maine State Police crime lab. She testified that she had never been asked to perform a search prior to that time, but it would be problematic for a number of reasons. MacMillan said the Maine database had twins, relatives, and duplicate samples within the database, so one would expect profiles to match based on those facts. *Dwyer*, 2009 ME 127, ¶ 14, 985 A.2d 469. The Maine trial court found that a comparison would not be reliable for those very reasons, pointing out that the results of the DNA comparison in Dwyer's case were produced, as in other cases using FBI population studies, not only the limited information from a state database. *Dwyer*, 2009 ME 127, ¶ 17, 985 A.2d 469.

¶ 144    On appeal, the Maine Supreme Court affirmed that ruling and noted that the expert gave logical reasons for her opinion that a comparative analysis would not produce scientifically reliable results. It concluded that the trial court did not abuse its discretion considering the limited evidence available to the court on the question of reliability.

¶ 145    Because defendant has not demonstrated that 9-loci pair-wise comparisons call into question the product rule or the validity of the random match probability calculations testified to by Jove, the trial court did not commit any error when it denied the motion for a database search. Because there was no error, there can be no plain error.

¶ 146    Defendant's next claim that the trial court improperly limited his right to cross-examine Jove regarding the Arizona database search is, in my opinion, also forfeited. It is forfeited primarily because there was no offer of proof made to preserve the issue at trial and on appeal.

¶ 147    The purpose of an offer of proof is to disclose to the trial judge the nature of offered evidence and to enable a reviewing court to determine whether the exclusion of the evidence was proper. *People v. Andrews*, 146 Ill. 2d 413, 420-21 (1992). The failure to make an offer of proof results in waiver of that issue on appeal. *Andrews*, 146 Ill. 2d at 420-21.

¶ 148    When defense counsel began to question the witness about the Arizona study, the State immediately objected. Before defense counsel responded, the trial judge remarked that he thought there were motions *in limine* regarding the study. Rather than respond further or set forth any basis for this area of inquiry, counsel moved onto another question. The trial court

did not formally rule on the objection, nor did it actually sustain the objection. There was no discussion of any kind after the trial judge's initial remarks. The colloquy in this regard simply ended. Based upon this limited exchange, the majority concludes defendant's right to effective cross-examination was erroneously denied. As with his request for the Illinois database search, defendant did not present or explain to the trial judge the relevance or significance of the results of the Arizona database study at his trial. He did not suggest how that study called into question the DNA evidence that was presented against defendant. Nor did he argue that the study called the product rule into question. There simply was no offer of proof. Under these circumstances, I do not agree that the trial court committed an error, let alone a serious or obvious error, that affected the fairness of defendant's trial and challenged the integrity of the judicial process.

¶ 149    By the time the defendant's jury trial commenced both the Arizona and an Illinois database search had been done. If these searches could have provided significant areas of cross-examination, defense counsel would have pursued them with an offer of proof.

¶ 150    In regard to the Illinois search, the record does show that defense counsel agreed not to question the State's witnesses about this fact. In any event, there was no ruling that would have precluded the use of either search by way of a defense expert. This path, however, appears not to have been taken for the very reason that comparing a database study with the DNA evidence would not have shed any relevant light on the other.

¶ 151    The majority has not addressed defendant's other claims on appeal because of the reversal and remand. In my opinion, those claims would not warrant a reversal of defendant's conviction and I would affirm.

¶ 152    Based upon the foregoing, I respectfully dissent from the decision to reverse and remand for a new trial.